# MISSOURI *v.* SEIBERT

No. 02–1371.   Argued December 9, 2003—Decided June 28, 2004

602

*Karen K. Mitchell*, Chief Deputy Attorney General of Missouri, argued the cause for petitioner. With her on the briefs were *Jeremiah W. (Jay) Nixon*, Attorney General, *James R. Layton*, State Solicitor, and *Shaun J. Mackelprang* and *Karen P. Hess*, Assistant Attorneys General.

*Irving L. Gornstein* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Olson, Acting Assistant Attorney General Wray, Deputy Solicitor General Dreeben*, and *Jonathan L. Marcus*.

*Amy M. Bartholow* argued the cause and filed a brief for respondent.*

---

*Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Jonathan L. Abram, Christopher T. Handman, William H. Johnson, Steven R. Shapiro*, and *Lisa Kemler;* and for Michael R. Bromwich et al. by *George A. Cumming, Jr., Charles D. Weisselberg, Stephen J. Schulhofer, Kirsten D. Levingston, Frederick A. O. Schwarz, Jr.*, and *Tom Gerety*.

JUSTICE SOUTER announced the judgment of the Court and delivered an opinion, in which JUSTICE STEVENS, JUSTICE GINSBURG, and JUSTICE BREYER join.

This case tests a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until interrogation has produced a confession. Although such a statement is generally inadmissible, since taken in violation of *Miranda* v. *Arizona*, 384 U. S. 436 (1966), the interrogating officer follows it with *Miranda* warnings and then leads the suspect to cover the same ground a second time. The question here is the admissibility of the repeated statement. Because this midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with *Miranda*'s constitutional requirement, we hold that a statement repeated after a warning in such circumstances is inadmissible.

I

Respondent Patrice Seibert's 12-year-old son Jonathan had cerebral palsy, and when he died in his sleep she feared charges of neglect because of bedsores on his body. In her presence, two of her teenage sons and two of their friends devised a plan to conceal the facts surrounding Jonathan's death by incinerating his body in the course of burning the family's mobile home, in which they planned to leave Donald Rector, a mentally ill teenager living with the family, to avoid any appearance that Jonathan had been unattended. Seibert's son Darian and a friend set the fire, and Donald died.

Five days later, the police awakened Seibert at 3 a.m. at a hospital where Darian was being treated for burns. In arresting her, Officer Kevin Clinton followed instructions from Rolla, Missouri, Officer Richard Hanrahan that he refrain from giving *Miranda* warnings. After Seibert had been taken to the police station and left alone in an interview room for 15 to 20 minutes, Officer Hanrahan questioned her

without *Miranda* warnings for 30 to 40 minutes, squeezing her arm and repeating "Donald was also to die in his sleep." App. 59 (internal quotation marks omitted). After Seibert finally admitted she knew Donald was meant to die in the fire, she was given a 20-minute coffee and cigarette break. Officer Hanrahan then turned on a tape recorder, gave Seibert the *Miranda* warnings, and obtained a signed waiver of rights from her. He resumed the questioning with "Ok, 'trice, we've been talking for a little while about what happened on Wednesday the twelfth, haven't we?" App. 66, and confronted her with her prewarning statements:

> Hanrahan: "Now, in discussion you told us, you told us that there was a[n] understanding about Donald."
>
> Seibert: "Yes."
>
> Hanrahan: "Did that take place earlier that morning?"
>
> Seibert: "Yes."
>
> Hanrahan: "And what was the understanding about Donald?"
>
> Seibert: "If they could get him out of the trailer, to take him out of the trailer."
>
> Hanrahan: "And if they couldn't?"
>
> Seibert: "I, I never even thought about it. I just figured they would."
>
> Hanrahan: "'Trice, didn't you tell me that he was supposed to die in his sleep?"
>
> Seibert: "If that would happen, 'cause he was on that new medicine, you know . . . ."
>
> Hanrahan: "The Prozac? And it makes him sleepy. So he was supposed to die in his sleep?"
>
> Seibert: "Yes." *Id.*, at 70.

After being charged with first-degree murder for her role in Donald's death, Seibert sought to exclude both her prewarning and postwarning statements. At the suppression hearing, Officer Hanrahan testified that he made a "conscious

decision" to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question "until I get the answer that she's already provided once." App. 31–34. He acknowledged that Seibert's ultimate statement was "largely a repeat of information . . . obtained" prior to the warning. *Id.*, at 30.

The trial court suppressed the prewarning statement but admitted the responses given after the *Miranda* recitation. A jury convicted Seibert of second-degree murder. On appeal, the Missouri Court of Appeals affirmed, treating this case as indistinguishable from *Oregon* v. *Elstad*, 470 U. S. 298 (1985). No. 23729, 2002 WL 114804 (Jan. 30, 2002) (not released for publication).

The Supreme Court of Missouri reversed, holding that "[i]n the circumstances here, where the interrogation was nearly continuous, . . . the second statement, clearly the product of the invalid first statement, should have been suppressed." 93 S. W. 3d 700, 701 (2002) (en banc). The court distinguished *Elstad* on the ground that warnings had not intentionally been withheld there, 93 S. W. 3d, at 704, and reasoned that "Officer Hanrahan's intentional omission of a *Miranda* warning was intended to deprive Seibert of the opportunity knowingly and intelligently to waive her *Miranda* rights," *id.*, at 706. Since there were "no circumstances that would seem to dispel the effect of the *Miranda* violation," the court held that the postwarning confession was involuntary and therefore inadmissible. *Ibid.* To allow the police to achieve an "end run" around *Miranda*, the court explained, would encourage *Miranda* violations and diminish *Miranda*'s role in protecting the privilege against self-incrimination. 93 S. W. 3d, at 706–707. Three judges dissented, taking the view that *Elstad* applied even though the police intentionally withheld *Miranda* warnings before the initial statement, and believing that "Seibert's unwarned responses to Officer Hanrahan's questioning did not prevent

her from waiving her rights and confessing." 93 S. W. 3d, at 708 (opinion of Benton, J.).

We granted certiorari, 538 U. S. 1031 (2003), to resolve a split in the Courts of Appeals. Compare *United States* v. *Gale*, 952 F. 2d 1412, 1418 (CADC 1992) (while "deliberate 'end run' around *Miranda*" would provide cause for suppression, case involved no conduct of that order); *United States* v. *Carter*, 884 F. 2d 368, 373 (CA8 1989) ("*Elstad* did not go so far as to fashion a rule permitting this sort of end run around *Miranda*"), with *United States* v. *Orso*, 266 F. 3d 1030, 1034–1039 (CA9 2001) (en banc) (rejecting argument that "tainted fruit" analysis applies because deliberate withholding of *Miranda* warnings constitutes an "improper tactic"); *United States* v. *Esquilin*, 208 F. 3d 315, 319–321 (CA1 2000) (similar). We now affirm.

## II

"In criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment . . . commanding that no person 'shall be compelled in any criminal case to be a witness against himself.'" *Bram* v. *United States*, 168 U. S. 532, 542 (1897). A parallel rule governing the admissibility of confessions in state courts emerged from the Due Process Clause of the Fourteenth Amendment, see, *e. g.*, *Brown* v. *Mississippi*, 297 U. S. 278 (1936), which governed state cases until we concluded in *Malloy* v. *Hogan*, 378 U. S. 1, 8 (1964), that "[t]he Fourteenth Amendment secures against state invasion the same privilege that the Fifth Amendment guarantees against federal infringement—the right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." In unifying the Fifth and Fourteenth Amendment voluntariness tests, *Malloy* "made clear what had already become apparent—that the substantive and procedural safe-

guards surrounding admissibility of confessions in state cases had become exceedingly exacting, reflecting all the policies embedded in the privilege" against self-incrimination. *Miranda*, 384 U. S., at 464.

In *Miranda*, we explained that the "voluntariness doctrine in the state cases . . . encompasses all interrogation practices which are likely to exert such pressure upon an individual as to disable him from making a free and rational choice," *id.*, at 464–465. We appreciated the difficulty of judicial enquiry *post hoc* into the circumstances of a police interrogation, *Dickerson* v. *United States*, 530 U. S. 428, 444 (2000), and recognized that "the coercion inherent in custodial interrogation blurs the line between voluntary and involuntary statements, and thus heightens the risk" that the privilege against self-incrimination will not be observed, *id.*, at 435. Hence our concern that the "traditional totality-of-the-circumstances" test posed an "unacceptably great" risk that involuntary custodial confessions would escape detection. *Id.*, at 442.

Accordingly, "to reduce the risk of a coerced confession and to implement the Self-Incrimination Clause," *Chavez* v. *Martinez*, 538 U. S. 760, 790 (2003) (KENNEDY, J., concurring in part and dissenting in part), this Court in *Miranda* concluded that "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored," 384 U. S., at 467. *Miranda* conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained.[1] Conversely, giving the warnings and getting a

---

[1] "[T]he burden of showing admissibility rests, of course, on the prosecution." *Brown* v. *Illinois*, 422 U. S. 590, 604 (1975). The prosecution bears the burden of proving, at least by a preponderance of the evidence, the *Miranda* waiver, *Colorado* v. *Connelly*, 479 U. S. 157, 169 (1986), and the voluntariness of the confession, *Lego* v. *Twomey*, 404 U. S. 477, 489 (1972).

waiver has generally produced a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver. See *Berkemer* v. *McCarty*, 468 U. S. 420, 433, n. 20 (1984) ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare"). To point out the obvious, this common consequence would not be common at all were it not that *Miranda* warnings are customarily given under circumstances allowing for a real choice between talking and remaining silent.

## III

There are those, of course, who preferred the old way of doing things, giving no warnings and litigating the voluntariness of any statement in nearly every instance. In the aftermath of *Miranda*, Congress even passed a statute seeking to restore that old regime, 18 U. S. C. § 3501, although the Act lay dormant for years until finally invoked and challenged in *Dickerson* v. *United States, supra*. *Dickerson* reaffirmed *Miranda* and held that its constitutional character prevailed against the statute.

The technique of interrogating in successive, unwarned and warned phases raises a new challenge to *Miranda*. Although we have no statistics on the frequency of this practice, it is not confined to Rolla, Missouri. An officer of that police department testified that the strategy of withholding *Miranda* warnings until after interrogating and drawing out a confession was promoted not only by his own department, but by a national police training organization and other departments in which he had worked. App. 31–32. Consistently with the officer's testimony, the Police Law Institute, for example, instructs that "officers may conduct a two-stage interrogation. . . . At any point during the pre-*Miranda* in-

terrogation, usually after arrestees have confessed, officers may then read the *Miranda* warnings and ask for a waiver. If the arrestees waive their *Miranda* rights, officers will be able to repeat any *subsequent* incriminating statements later in court." Police Law Institute, Illinois Police Law Manual 83 (Jan. 2001–Dec. 2003) (available in Clerk of Court's case file) (hereinafter Police Law Manual) (emphasis in original).[2]

---

[2] Emphasizing the impeachment exception to the *Miranda* rule approved by this Court, *Harris* v. *New York*, 401 U. S. 222 (1971), some training programs advise officers to omit *Miranda* warnings altogether or to continue questioning after the suspect invokes his rights. See, *e. g.*, Police Law Manual 83 ("There is no need to give a *Miranda* warning before asking questions if . . . the answers given . . . will not be required by the prosecutor during the prosecution's case-in-chief"); California Commission on Peace Officer Standards and Training, Video Training Programs for California Law Enforcement, Miranda: Post-Invocation Questioning (broadcast July 11, 1996) ("We . . . have been encouraging you to continue to question a suspect after they've invoked their *Miranda* rights"); D. Zulawski & D. Wicklander, Practical Aspects of Interview and Interrogation 50–51 (2d ed. 2002) (describing the practice of "[b]eachheading" as useful for impeachment purpose (emphasis deleted)); see also Weisselberg, Saving *Miranda*, 84 Cornell L. Rev. 109, 110, 132–139 (1998) (collecting California training materials encouraging questioning "outside *Miranda*"). This training is reflected in the reported cases involving deliberate questioning after invocation of *Miranda* rights. See, *e. g.*, *California Attorneys for Criminal Justice* v. *Butts*, 195 F. 3d 1039, 1042–1044 (CA9 1999); *Henry* v. *Kernan*, 197 F. 3d 1021, 1026 (CA9 1999); *People* v. *Neal*, 31 Cal. 4th 63, 68, 72 P. 3d 280, 282 (2003); *People* v. *Peevy*, 17 Cal. 4th 1184, 1189, 953 P. 2d 1212, 1215 (1998). Scholars have noted the growing trend of such practices. See, *e. g.*, Leo, Questioning the Relevance of *Miranda* in the Twenty-First Century, 99 Mich. L. Rev. 1000, 1010 (2001); Weisselberg, In the Stationhouse After *Dickerson*, 99 Mich. L. Rev. 1121, 1123–1154 (2001).

It is not the case, of course, that law enforcement educators en masse are urging that *Miranda* be honored only in the breach. See, *e. g.*, C. O'Hara & G. O'Hara, Fundamentals of Criminal Investigation 133 (7th ed. 2003) (instructing police to give *Miranda* warnings before conducting custodial interrogation); F. Inbau, J. Reid, & J. Buckley, Criminal Interrogation and Confessions 221 (3d ed. 1986) (hereinafter Inbau, Reid, & Buckley) (same); J. Reid & Assoc., Interviewing & Interrogation: The Reid Technique 61 (1991) (same). Most police manuals do not advocate the question-first tactic, because they understand that *Oregon* v. *Elstad*,

The upshot of all this advice is a question-first practice of some popularity, as one can see from the reported cases describing its use, sometimes in obedience to departmental policy.[3]

## IV

When a confession so obtained is offered and challenged, attention must be paid to the conflicting objects of *Miranda* and question-first. *Miranda* addressed "interrogation practices . . . likely . . . to disable [an individual] from making a free and rational choice" about speaking, 384 U. S., at 464–465, and held that a suspect must be "adequately and effectively" advised of the choice the Constitution guarantees, *id.*, at 467. The object of question-first is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed.

Just as "no talismanic incantation [is] required to satisfy [*Miranda*'s] strictures," *California* v. *Prysock*, 453 U. S. 355, 359 (1981) *(per curiam)*, it would be absurd to think that mere recitation of the litany suffices to satisfy *Miranda* in every conceivable circumstance. "The inquiry is simply whether the warnings reasonably 'convey] to [a suspect] his rights as required by *Miranda*.'" *Duckworth* v. *Eagan*, 492 U. S. 195, 203 (1989) (quoting *Prysock, supra,* at 361). The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function "effec-

---

470 U. S. 298 (1985), involved an officer's good-faith failure to warn. See, *e. g.,* Inbau, Reid, & Buckley 241 (*Elstad*'s "facts as well as [its] specific holding" instruct that "where an interrogator has failed to administer the *Miranda* warnings in the mistaken belief that, under the circumstances of the particular case, the warnings were not required, . . . corrective measures . . . salvage an interrogation opportunity").

[3] See, *e. g., United States* v. *Orso*, 266 F. 3d 1030, 1032–1033 (CA9 2001) (en banc); *Pope* v. *Zenon*, 69 F. 3d 1018, 1023–1024 (CA9 1995), overruled by *Orso, supra; Cooper* v. *Dupnik*, 963 F. 2d 1220, 1224–1227, 1249 (CA9 1992) (en banc); *United States* v. *Carter*, 884 F. 2d 368, 373 (CA9 1989); *United States* v. *Esquilin*, 208 F. 3d 315, 317 (CA1 2000); *Davis* v. *United States*, 724 A. 2d 1163, 1165–1166 (D. C. App. 1998).

tively" as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make such an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda,* or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment.[4]

There is no doubt about the answer that proponents of question-first give to this question about the effectiveness of

---

[4] Respondent Seibert argues that her second confession should be excluded from evidence under the doctrine known by the metaphor of the "fruit of the poisonous tree," developed in the Fourth Amendment context in *Wong Sun* v. *United States,* 371 U. S. 471 (1963): evidence otherwise admissible but discovered as a result of an earlier violation is excluded as tainted, lest the law encourage future violations. But the Court in *Elstad* rejected the *Wong Sun* fruits doctrine for analyzing the admissibility of a subsequent warned confession following "an initial failure . . . to administer the warnings required by *Miranda."* *Elstad,* 470 U. S., at 300. In *Elstad,* "a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will," did not "so tain[t] the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Id.,* at 309. *Elstad* held that "a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Id.,* at 318. In a sequential confession case, clarity is served if the later confession is approached by asking whether in the circumstances the *Miranda* warnings given could reasonably be found effective. If yes, a court can take up the standard issues of voluntary waiver and voluntary statement; if no, the subsequent statement is inadmissible for want of adequate *Miranda* warnings, because the earlier and later statements are realistically seen as parts of a single, unwarned sequence of questioning.

warnings given only after successful interrogation, and we think their answer is correct. By any objective measure, applied to circumstances exemplified here, it is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content. After all, the reason that question-first is catching on is as obvious as its manifest purpose, which is to get a confession the suspect would not make if he understood his rights at the outset; the sensible underlying assumption is that with one confession in hand before the warnings, the interrogator can count on getting its duplicate, with trifling additional trouble. Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again.[5] A more likely reaction on a suspect's part would be perplexity about the reason for discussing rights at that point, bewilderment being an unpromising frame of mind for knowledgeable decision. What is worse, telling a suspect that "anything you say can and will be used against you," without expressly excepting the statement just given, could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail. Thus, when *Miranda* warnings are inserted in the midst of coordinated and continuing interrogation, they are likely to mislead and "de-

---

[5] It bears emphasizing that the effectiveness *Miranda* assumes the warnings can have must potentially extend through the repeated interrogation, since a suspect has a right to stop at any time. It seems highly unlikely that a suspect could retain any such understanding when the interrogator leads him a second time through a line of questioning the suspect has already answered fully. The point is not that a later unknowing or involuntary confession cancels out an earlier, adequate warning; the point is that the warning is unlikely to be effective in the question-first sequence we have described.

priv[e] a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Moran* v. *Burbine*, 475 U. S. 412, 424 (1986). By the same token, it would ordinarily be unrealistic to treat two spates of integrated and proximately conducted questioning as independent interrogations subject to independent evaluation simply because *Miranda* warnings formally punctuate them in the middle.

## V

Missouri argues that a confession repeated at the end of an interrogation sequence envisioned in a question-first strategy is admissible on the authority of *Oregon* v. *Elstad*, 470 U. S. 298 (1985), but the argument disfigures that case. In *Elstad*, the police went to the young suspect's house to take him into custody on a charge of burglary. Before the arrest, one officer spoke with the suspect's mother, while the other one joined the suspect in a "brief stop in the living room," *id.*, at 315, where the officer said he "felt" the young man was involved in a burglary, *id.*, at 301 (internal quotation marks omitted). The suspect acknowledged he had been at the scene. *Ibid.* This Court noted that the pause in the living room "was not to interrogate the suspect but to notify his mother of the reason for his arrest," *id.*, at 315, and described the incident as having "none of the earmarks of coercion," *id.*, at 316. The Court, indeed, took care to mention that the officer's initial failure to warn was an "oversight" that "may have been the result of confusion as to whether the brief exchange qualified as 'custodial interrogation' or . . . may simply have reflected . . . reluctance to initiate an alarming police procedure before [an officer] had spoken with respondent's mother." *Id.*, at 315–316. At the outset of a later and systematic station house interrogation going well beyond the scope of the laconic prior admission, the suspect was given *Miranda* warnings and made a full confession. *Elstad, supra*, at 301, 314–315. In holding the

second statement admissible and voluntary, *Elstad* rejected the "cat out of the bag" theory that any short, earlier admission, obtained in arguably innocent neglect of *Miranda*, determined the character of the later, warned confession, *Elstad*, 470 U. S., at 311–314; on the facts of that case, the Court thought any causal connection between the first and second responses to the police was "speculative and attenuated," *id.*, at 313. Although the *Elstad* Court expressed no explicit conclusion about either officer's state of mind, it is fair to read *Elstad* as treating the living room conversation as a good-faith *Miranda* mistake, not only open to correction by careful warnings before systematic questioning in that particular case, but posing no threat to warn-first practice generally. See *Elstad, supra,* at 309 (characterizing the officers' omission of *Miranda* warnings as "a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will"); 470 U. S., at 318, n. 5 (Justice Brennan's concern in dissent that *Elstad* would invite question-first practice "distorts the reasoning and holding of our decision, but, worse, invites trial courts and prosecutors to do the same").

The contrast between *Elstad* and this case reveals a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first. In *Elstad*, it was not unreasonable to see the occasion for questioning at the station house as presenting a markedly different experience from the short conversation at home; since a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience, the *Miranda*

warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission.

At the opposite extreme are the facts here, which by any objective measure reveal a police strategy adapted to undermine the *Miranda* warnings.[6] The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid. The warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment. When the same officer who had conducted the first phase recited the *Miranda* warnings, he said nothing to counter the probable misimpression that the advice that anything Seibert said could be used against her also applied to the details of the inculpatory statement previously elicited. In particular, the police did not advise that her prior statement could not be used.[7] Nothing was said or done to dispel the oddity of warning about legal rights to silence and counsel right after the police had led her through a systematic interrogation, and any uncertainty on her part about a right to stop talking about matters previously discussed would only have been aggravated by the way Officer Hanrahan set the scene by saying "we've been talking for a little while about what happened on Wednesday the twelfth, haven't we?" App. 66. The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given. It

---

[6] Because the intent of the officer will rarely be as candidly admitted as it was here (even as it is likely to determine the conduct of the interrogation), the focus is on facts apart from intent that show the question-first tactic at work.

[7] We do not hold that a formal addendum warning that a previous statement could not be used would be sufficient to change the character of the question-first procedure to the point of rendering an ensuing statement admissible, but its absence is clearly a factor that blunts the efficacy of the warnings and points to a continuing, not a new, interrogation.

would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before. These circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk.[8]

## VI

Strategists dedicated to draining the substance out of *Miranda* cannot accomplish by training instructions what *Dickerson* held Congress could not do by statute. Because the question-first tactic effectively threatens to thwart *Miranda*'s purpose of reducing the risk that a coerced confession would be admitted, and because the facts here do not reasonably support a conclusion that the warnings given could have served their purpose, Seibert's postwarning statements are inadmissible. The judgment of the Supreme Court of Missouri is affirmed.

*It is so ordered.*

JUSTICE BREYER, concurring.

In my view, the following simple rule should apply to the two-stage interrogation technique: Courts should exclude the "fruits" of the initial unwarned questioning unless the failure to warn was in good faith. Cf. *Oregon v. Elstad,* 470 U. S. 298, 309, 318, n. 5 (1985); *United States v. Leon,* 468 U. S. 897 (1984). I believe this is a sound and workable approach to the problem this case presents. Prosecutors and judges have long understood how to apply the "fruits" approach, which they use in other areas of law. See *Wong Sun v. United States,* 371 U. S. 471 (1963). And in the workaday

---

[8] Because we find that the warnings were inadequate, there is no need to assess the actual voluntariness of the statement.

world of criminal law enforcement the administrative simplicity of the familiar has significant advantages over a more complex exclusionary rule. Cf. *post*, at 628–629 (O'CONNOR, J., dissenting).

I believe the plurality's approach in practice will function as a "fruits" test. The truly "effective" *Miranda* warnings on which the plurality insists, *ante*, at 615, will occur only when certain circumstances—a lapse in time, a change in location or interrogating officer, or a shift in the focus of the questioning—intervene between the unwarned questioning and any postwarning statement. Cf. *Taylor* v. *Alabama*, 457 U. S. 687, 690 (1982) (evidence obtained subsequent to a constitutional violation must be suppressed as "fruit of the poisonous tree" unless "intervening events break the causal connection").

I consequently join the plurality's opinion in full. I also agree with JUSTICE KENNEDY's opinion insofar as it is consistent with this approach and makes clear that a good-faith exception applies. See *post*, at 622 (opinion concurring in judgment).

JUSTICE KENNEDY, concurring in the judgment.

The interrogation technique used in this case is designed to circumvent *Miranda* v. *Arizona*, 384 U. S. 436 (1966). It undermines the *Miranda* warning and obscures its meaning. The plurality opinion is correct to conclude that statements obtained through the use of this technique are inadmissible. Although I agree with much in the careful and convincing opinion for the plurality, my approach does differ in some respects, requiring this separate statement.

The *Miranda* rule has become an important and accepted element of the criminal justice system. See *Dickerson* v. *United States*, 530 U. S. 428 (2000). At the same time, not every violation of the rule requires suppression of the evidence obtained. Evidence is admissible when the central

concerns of *Miranda* are not likely to be implicated and when other objectives of the criminal justice system are best served by its introduction. Thus, we have held that statements obtained in violation of the rule can be used for impeachment, so that the truth-finding function of the trial is not distorted by the defense, see *Harris* v. *New York,* 401 U. S. 222 (1971); that there is an exception to protect countervailing concerns of public safety, see *New York* v. *Quarles,* 467 U. S. 649 (1984); and that physical evidence obtained in reliance on statements taken in violation of the rule is admissible, see *United States* v. *Patane, post,* p. 630. These cases, in my view, are correct. They recognize that admission of evidence is proper when it would further important objectives without compromising *Miranda'*s central concerns. Under these precedents, the scope of the *Miranda* suppression remedy depends on a consideration of those legitimate interests and on whether admission of the evidence under the circumstances would frustrate *Miranda'*s central concerns and objectives.

*Oregon* v. *Elstad,* 470 U. S. 298 (1985), reflects this approach. In *Elstad,* a suspect made an initial incriminating statement at his home. The suspect had not received a *Miranda* warning before making the statement, apparently because it was not clear whether the suspect was in custody at the time. The suspect was taken to the station house, where he received a proper warning, waived his *Miranda* rights, and made a second statement. He later argued that the postwarning statement should be suppressed because it was related to the unwarned first statement, and likely induced or caused by it. The Court held that, although a *Miranda* violation made the first statement inadmissible, the postwarning statements could be introduced against the accused because "neither the general goal of deterring improper police conduct nor the Fifth Amendment goal of assuring trustworthy evidence would be served by suppres-

sion" given the facts of that case. *Elstad, supra,* at 308 (citing *Michigan* v. *Tucker,* 417 U. S. 433, 445 (1974)).

In my view, *Elstad* was correct in its reasoning and its result. *Elstad* reflects a balanced and pragmatic approach to enforcement of the *Miranda* warning. An officer may not realize that a suspect is in custody and warnings are required. The officer may not plan to question the suspect or may be waiting for a more appropriate time. Skilled investigators often interview suspects multiple times, and good police work may involve referring to prior statements to test their veracity or to refresh recollection. In light of these realities it would be extravagant to treat the presence of one statement that cannot be admitted under *Miranda* as sufficient reason to prohibit subsequent statements preceded by a proper warning. See *Elstad,* 470 U. S., at 309 ("It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings . . . so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period"). That approach would serve "neither the general goal of deterring improper police conduct nor the Fifth Amendment goal of assuring trustworthy evidence would be served by suppression of the . . . testimony." *Id.,* at 308.

This case presents different considerations. The police used a two-step questioning technique based on a deliberate violation of *Miranda.* The *Miranda* warning was withheld to obscure both the practical and legal significance of the admonition when finally given. As JUSTICE SOUTER points out, the two-step technique permits the accused to conclude that the right not to respond did not exist when the earlier incriminating statements were made. The strategy is based on the assumption that *Miranda* warnings will tend to mean less when recited midinterrogation, after inculpatory statements have already been obtained. This tactic relies on an intentional misrepresentation of the protection that *Mi-*

*randa* offers and does not serve any legitimate objectives that might otherwise justify its use.

Further, the interrogating officer here relied on the defendant's prewarning statement to obtain the postwarning statement used against her at trial. The postwarning interview resembled a cross-examination. The officer confronted the defendant with her inadmissible prewarning statements and pushed her to acknowledge them. See App. 70 ("'Trice, didn't you tell me that he was supposed to die in his sleep?'"). This shows the temptations for abuse inherent in the two-step technique. Reference to the prewarning statement was an implicit suggestion that the mere repetition of the earlier statement was not independently incriminating. The implicit suggestion was false.

The technique used in this case distorts the meaning of *Miranda* and furthers no legitimate countervailing interest. The *Miranda* rule would be frustrated were we to allow police to undermine its meaning and effect. The technique simply creates too high a risk that postwarning statements will be obtained when a suspect was deprived of "knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Moran* v. *Burbine*, 475 U. S. 412, 423–424 (1986). When an interrogator uses this deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview, postwarning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps.

The plurality concludes that whenever a two-stage interview occurs, admissibility of the postwarning statement should depend on "whether [the] *Miranda* warnings delivered midstream could have been effective enough to accomplish their object" given the specific facts of the case. *Ante*, at 615. This test envisions an objective inquiry from the perspective of the suspect, and applies in the case of both intentional and unintentional two-stage interrogations.

*Ante*, at 615–617. In my view, this test cuts too broadly. *Miranda*'s clarity is one of its strengths, and a multifactor test that applies to every two-stage interrogation may serve to undermine that clarity. Cf. *Berkemer* v. *McCarty*, 468 U. S. 420, 430 (1984). I would apply a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning.

The admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made. Curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver. For example, a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn. Cf. *Westover* v. *United States*, decided with *Miranda* v. *Arizona*, 384 U. S. 436 (1966). Alternatively, an additional warning that explains the likely inadmissibility of the prewarning custodial statement may be sufficient. No curative steps were taken in this case, however, so the postwarning statements are inadmissible and the conviction cannot stand.

For these reasons, I concur in the judgment of the Court.

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE THOMAS join, dissenting.

The plurality devours *Oregon* v. *Elstad*, 470 U. S. 298 (1985), even as it accuses petitioner's argument of "disfigur[ing]" that decision. *Ante*, at 614. I believe that we

are bound by *Elstad* to reach a different result, and I would vacate the judgment of the Supreme Court of Missouri.

## I

On two preliminary questions I am in full agreement with the plurality. First, the plurality appropriately follows *Elstad* in concluding that Seibert's statement cannot be held inadmissible under a "fruit of the poisonous tree" theory. *Ante*, at 612, n. 4 (internal quotation marks omitted). Second, the plurality correctly declines to focus its analysis on the subjective intent of the interrogating officer.

## A

This Court has made clear that there simply is no place for a robust deterrence doctrine with regard to violations of *Miranda* v. *Arizona*, 384 U. S. 436 (1966). See *Dickerson* v. *United States*, 530 U. S. 428, 441 (2000) ("Our decision in *[Elstad]*—refusing to apply the traditional 'fruits' doctrine developed in Fourth Amendment cases—. . . simply recognizes the fact that unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment"); *Elstad, supra*, at 306 (unlike the Fourth Amendment exclusionary rule, the "*Miranda* exclusionary rule . . . serves the Fifth Amendment and sweeps more broadly than the Fifth Amendment itself"); see also *United States* v. *Patane, post*, at 644–645 (KENNEDY, J., concurring in judgment) (refusal to suppress evidence obtained following an unwarned confession in *Elstad, New York* v. *Quarles*, 467 U. S. 649 (1984), and *Harris* v. *New York*, 401 U. S. 222 (1971), was based on "our recognition that the concerns underlying the *Miranda* . . . rule must be accommodated to other objectives of the criminal justice system"). Consistent with that view, the Court today refuses to apply the traditional "fruits" analysis to the physical fruit of a claimed *Miranda* violation. *Patane, post*, p. 630. The plu-

rality correctly refuses to apply a similar analysis to testimonial fruits.

Although the analysis the plurality ultimately espouses examines the same facts and circumstances that a "fruits" analysis would consider (such as the lapse of time between the two interrogations and change of questioner or location), it does so for entirely different reasons. The fruits analysis would examine those factors because they are relevant to the balance of deterrence value versus the "drastic and socially costly course" of excluding reliable evidence. *Nix* v. *Williams*, 467 U. S. 431, 442–443 (1984). The plurality, by contrast, looks to those factors to inform the *psychological* judgment regarding whether the suspect has been informed effectively of her right to remain silent. The analytical underpinnings of the two approaches are thus entirely distinct, and they should not be conflated just because they function similarly in practice. Cf. *ante*, at 617–618 (BREYER, J., concurring).

## B

The plurality's rejection of an intent-based test is also, in my view, correct. Freedom from compulsion lies at the heart of the Fifth Amendment, and requires us to assess whether a suspect's decision to speak truly was voluntary. Because voluntariness is a matter of the suspect's state of mind, we focus our analysis on the way in which suspects experience interrogation. See generally *Miranda*, 384 U. S., at 455 (summarizing psychological tactics used by police that "undermin[e]" the suspect's "will to resist," and noting that "the very fact of custodial interrogation . . . trades on the weakness of individuals"); *id.*, at 467 ("[I]n-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely").

Thoughts kept inside a police officer's head cannot affect that experience. See *Moran* v. *Burbine*, 475 U. S. 412, 422

(1986) ("Events occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right"). In *Moran,* an attorney hired by the suspect's sister had been trying to contact the suspect and was told by the police, falsely, that they would not begin an interrogation that night. *Id.,* at 416–418. The suspect was not aware that an attorney had been hired for him. *Id.,* at 417. We rejected an analysis under which a different result would obtain for "the same defendant, armed with the same information and confronted with precisely the same police conduct" if something not known to the defendant—such as the fact that an attorney was attempting to contact him— had been different. *Id.,* at 422. The same principle applies here. A suspect who experienced exactly the same interrogation as Seibert, save for a difference in the undivulged, subjective intent of the interrogating officer when he failed to give *Miranda* warnings, would not experience the interrogation any differently. "[W]hether intentional or inadvertent, the state of mind of the police is irrelevant to the question of the intelligence and voluntariness of respondent's election to abandon his rights. Although highly inappropriate, even deliberate deception of an attorney could not possibly affect a suspect's decision to waive his *Miranda* rights unless he were at least aware of the incident." 475 U. S., at 423. Cf. *Stansbury* v. *California,* 511 U. S. 318, 324–325 (1994) *(per curiam)* (police officer's subjective intent is irrelevant to whether suspect is in custody for *Miranda* purposes; "one cannot expect the person under interrogation to probe the officer's innermost thoughts").

Because the isolated fact of Officer Hanrahan's intent could not have had any bearing on Seibert's "capacity to comprehend and knowingly relinquish" her right to remain silent, *Moran, supra,* at 422, it could not by itself affect the voluntariness of her confession. Moreover, recognizing an exception to *Elstad* for intentional violations would require focus-

ing constitutional analysis on a police officer's subjective intent, an unattractive proposition that we all but uniformly avoid. In general, "we believe that 'sending state and federal courts on an expedition into the minds of police officers would produce a grave and fruitless misallocation of judicial resources.'" *United States* v. *Leon,* 468 U. S. 897, 922, n. 23 (1984) (quoting *Massachusetts* v. *Painten,* 389 U. S. 560, 565 (1968) (White, J., dissenting)). This case presents the uncommonly straightforward circumstance of an officer openly admitting that the violation was intentional. But the inquiry will be complicated in other situations probably more likely to occur. For example, different officers involved in an interrogation might claim different states of mind regarding the failure to give *Miranda* warnings. Even in the simple case of a single officer who claims that a failure to give *Miranda* warnings was inadvertent, the likelihood of error will be high. See W. LaFave, Search and Seizure § 1.4(e), p. 124 (3d ed. 1996) ("[T]here is no reason to believe that courts can with any degree of success determine in which instances the police had an ulterior motive").

These evidentiary difficulties have led us to reject an intent-based test in several criminal procedure contexts. For example, in *New York* v. *Quarles,* one of the factors that led us to reject an inquiry into the subjective intent of the police officer in crafting a test for the "public safety" exception to *Miranda* was that officers' motives will be "largely unverifiable." 467 U. S., at 656. Similarly, our opinion in *Whren* v. *United States,* 517 U. S. 806, 813–814 (1996), made clear that "the evidentiary difficulty of establishing subjective intent" was one of the reasons (albeit not the principal one) for refusing to consider intent in Fourth Amendment challenges generally.

For these reasons, I believe that the approach espoused by JUSTICE KENNEDY is ill advised. JUSTICE KENNEDY would extend *Miranda*'s exclusionary rule to any case in which the use of the "two-step interrogation technique" was "deliber-

ate" or "calculated." *Ante,* at 622 (opinion concurring in judgment). This approach untethers the analysis from facts knowable to, and therefore having any potential directly to affect, the suspect. Far from promoting "clarity," *ibid.,* the approach will add a third step to the suppression inquiry. In virtually every two-stage interrogation case, in addition to addressing the standard *Miranda* and voluntariness questions, courts will be forced to conduct the kind of difficult, state-of-mind inquiry that we normally take pains to avoid.

## II

The plurality's adherence to *Elstad,* and mine to the plurality, end there. Our decision in *Elstad* rejected two lines of argument advanced in favor of suppression. The first was based on the "fruit of the poisonous tree" doctrine, discussed above. The second was the argument that the "lingering compulsion" inherent in a defendant's having let the "cat out of the bag" required suppression. 470 U. S., at 311. The Court of Appeals of Oregon, in accepting the latter argument, had endorsed a theory indistinguishable from the one today's plurality adopts: "[T]he coercive impact of the unconstitutionally obtained statement remains, because in a defendant's mind it has sealed his fate. It is this impact that must be dissipated in order to make a subsequent confession admissible." *State* v. *Elstad,* 61 Ore. App. 673, 677, 658 P. 2d 552, 554 (1983).

We rejected this theory outright. We did so not because we refused to recognize the "psychological impact of the suspect's conviction that he has let the cat out of the bag," but because we refused to "endo[w]" those "psychological effects" with "constitutional implications." 470 U. S., at 311. To do so, we said, would "effectively immuniz[e] a suspect who responds to pre-*Miranda* warning questions from the consequences of his subsequent informed waiver," an immunity that "comes at a high cost to legitimate law enforcement activity, while adding little desirable protection to the indi-

vidual's interest in not being *compelled* to testify against himself." *Id.*, at 312. The plurality might very well think that we struck the balance between Fifth Amendment rights and law enforcement interests incorrectly in *Elstad*; but that is not normally a sufficient reason for ignoring the dictates of *stare decisis*.

I would analyze the two-step interrogation procedure under the voluntariness standards central to the Fifth Amendment and reiterated in *Elstad*. *Elstad* commands that if Seibert's first statement is shown to have been involuntary, the court must examine whether the taint dissipated through the passing of time or a change in circumstances: "When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." *Id.*, at 310 (citing *Westover* v. *United States*, decided with *Miranda*, 384 U. S., at 494). In addition, Seibert's second statement should be suppressed if she showed that it was involuntary despite the *Miranda* warnings. *Elstad, supra,* at 318 ("The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements"). Although I would leave this analysis for the Missouri courts to conduct on remand, I note that, unlike the officers in *Elstad*, Officer Hanrahan referred to Seibert's unwarned statement during the second part of the interrogation when she made a statement at odds with her unwarned confession. App. 70 (" 'Trice, didn't you tell me that he was supposed to die in his sleep?'"); cf. *Elstad, supra,* at 316 (officers did not "exploit the unwarned admission to pressure respondent into waiving his right to remain silent"). Such a tactic may bear on the voluntariness inquiry. Cf. *Frazier* v. *Cupp*, 394 U. S. 731, 739 (1969) (fact that police had falsely

told a suspect that his accomplice had already confessed was "relevant" to the voluntariness inquiry); *Moran*, 475 U. S., at 423–424 (in discussing police deception, stating that simply withholding information is "relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them"); *Miranda*, *supra*, at 476.

\*   \*   \*

Because I believe that the plurality gives insufficient deference to *Elstad* and that JUSTICE KENNEDY places improper weight on subjective intent, I respectfully dissent.