MEMORANDUM OPINION


No. 04-06-00776-CR


James REECE,

Appellant


v.


THE STATE OF TEXAS,

Appellee


From the 218th Judicial District Court, Atascosa County, Texas 

Trial Court No. 05-02-0058-CRA

Honorable Donna Rayes, Judge Presiding


Opinion by: Sandee Bryan Marion, Justice

 

Sitting: Karen Angelini, Justice

 Sandee Bryan Marion, Justice

 Rebecca Simmons, Justice


Delivered and Filed: January 16, 2008


AFFIRMED



 A jury found defendant, James Reece, guilty of murder, and assessed punishment at fifteen
years' confinement. We affirm.

DEFENDANT'S WRITTEN STATEMENTS

 The defendant provided two written statements; the trial court suppressed the first and
admitted the second. On appeal, defendant contends his second statement was inadmissible because
the first statement did not provide him with the language required by Texas Code of Criminal
Procedure article 38.22, which generally precludes the use of a defendant's statements that result
from custodial interrogation absent compliance with its procedural safeguards. See Tex. Code Crim.
Proc. Ann. art. 38.22 (Vernon 2005). Article 38.22 safeguards require that "the face of the
statement" show the following:

 (a) the accused, prior to making the statement, either received from a
magistrate the warning provided in Article 15.17 of this code or received from the
person to whom the statement is made a warning that:

 (1) he has the right to remain silent and not make any statement at all and that
any statement he makes may be used against him at his trial;

 (2) any statement he makes may be used as evidence against him in court;

 (3) he has the right to have a lawyer present to advise him prior to and during
any questioning; 

 (4) if he is unable to employ a lawyer, he has the right to have a lawyer
appointed to advise him prior to and during any questioning; and

 (5) he has the right to terminate the interview at any time; and

 (b) the accused, prior to and during the making of the statement, knowingly,
intelligently, and voluntarily waived the rights set out in the warning prescribed by
Subsection (a) of this section.

 

Tex. Code Crim. Proc. Ann. art. 38.22, § 2(a)-(b).

 The events preceding defendant's providing his written statements are, for the most part, not
in dispute. In mid-November 2004, Scott Brown, an officer with the Jourdanton Police Department,
received a missing person report on a Bernice Evans. Later, after Brown had gone home, Tammy
Clark, the mayor of Jourdanton, came to the police station with defendant, who was identified as her
boyfriend. Eric Kaiser, also an officer with the Jourdanton Police Department, was on-duty when
Clark and defendant arrived at the station. Kaiser said he initially spoke to Clark in the station's
parking lot, and it was at this time that Clark told him that defendant had killed Evans. Kaiser then
convinced both Clark and defendant to come inside the police station. Once inside the station,
Kaiser Mirandized defendant, but he did not place defendant in handcuffs. Kaiser testified that he
did not place defendant under arrest, but "he was no longer free to leave until I found out what was
going on." 

 After Kaiser Mirandized defendant, Kaiser asked defendant if he had killed Evans. Kaiser
testified that defendant, who was very emotional and was crying and rocking back and forth in his
chair, responded that he had killed Evans with a hammer. Defendant also told Kaiser the location
of the body. None of these oral statements were recorded. When Brown arrived back at the station,
he and Kaiser placed defendant into a patrol car. Kaiser stated he again Mirandized defendant, this
time with the patrol car's microphone turned on. Defendant then directed the officers to the location
of Evans's body. 

 While other police officers processed the scene where the body was located, Brown returned
with defendant to the police station. Brown sat with defendant in an interrogation room and, after
again Mirandizing defendant, discussed the events leading to Evans's murder. This time,
defendant's statement was videotaped and reduced to writing. After Brown typed and printed
defendant's statement, he asked defendant to read and sign the statement, which defendant did. 
Brown testified that a few days later, he realized he had not included the Miranda warnings and
waiver language required by article 38.22 in the written statement. Brown retyped the statement,
word-for-word, included the Miranda warnings and waiver, and took the statement to the sheriff's
department where defendant was being held. Brown again Mirandized defendant, and then
explained to defendant the error on the initial statement. Brown asked defendant if he would be
willing to sign the second statement and he told defendant to re-read the statement before signing
it. Brown testified defendant agreed to sign the statement but defendant said he did not want to re-read the statement. Because Brown believed defendant's not reading the statement "might be an
issue later on," he again asked defendant to read the statement. Brown testified that defendant
explained he was having bad dreams and did not want to relive the details. Brown then asked
another officer to read both statements for the purpose of comparing the two to ensure they were
identical in every way except for the addition of the article 38.22 language on the second statement. 
Defendant then placed his initials next to each of the Miranda warnings and the waiver language and
signed the second statement.

 We conclude defendant made his statements to the police while in custody; therefore, the
issue becomes whether the procedural safeguards of article 38.22, section 2 were satisfied. 
Defendant contends the second statement is inadmissible because the insufficient warnings of the
first statement invalidated the second statement. We disagree. Defendant placed his initials next
to each of the section 2(a) Miranda rights listed on the second statement and next to the section 2(b)
waiver of those rights. In Garcia v. State, 919 S.W.2d 370 (Tex. Crim. App. 1996) (op. on reh'g),
the section 2(b) waiver was missing from the statement altogether. Present on each page of the
statement, however, were the section 2(a) warnings, the appellant's initials next to those warnings,
and a statement next to the appellant's signature on each page certifying that the facts were true and
correct, he had made no request for the advice or presence of a lawyer before or during any part of
the statement, he did not request that the statement be stopped before it was finished, and he was not
told or prompted what to say in the statement. Id. at 384-85, 386. Based on the totality of these
circumstances, the Texas Court of Criminal Appeals was "persuaded . . . that, though a close call,
appellant did, on the face of his voluntary statement, knowingly, voluntarily and intelligently waive
his Section 2(a) rights in a manner sufficient to comply with the legislature's intent when it enacted
Section 2(b)." Id. at 387. In this case, we believe there is no "close call." Unlike in Garcia, the
section 2(b) waiver is present in defendant's statement on the top portion of the first page,
immediately below the section 2(a) warnings. It is thus indisputable that both the section 2(a)
warnings and the section 2(b) waiver of those rights are shown on the face of defendant's statement,
as article 38.22 requires.
 Defendant also argues that because a single interrogation produced both statements, if the
first statement was inadmissible, then the second statement also was inadmissible. Defendant
compares his statements to the statements made by the defendant in Missouri v. Seibert, 542 U.S.
600 (2004). In Seibert, the suspect was taken to the police station and left alone in an interview
room for fifteen to twenty minutes. Id. at 604. Without giving Miranda warnings, an officer entered
the room and questioned Seibert for thirty to forty minutes, eventually obtaining a confession. Id.
at 605. The officer then left the interview room, returned twenty minutes later with a tape recorder,
gave Seibert the Miranda warnings, and began asking her to repeat the same information she had
previously told the officer. Id. Concluding that this "question-first tactic effectively threatens to
thwart Miranda's purpose of reducing the risk that a coerced confession would be admitted," the
Supreme Court held that Seibert's post-Miranda statements were inadmissible. Id. at 617. 

 Defendant's reliance on Seibert is misplaced because here defendant was Mirandized by
Kaiser before he gave either of his statements. On this record, we conclude the trial court did not
abuse its discretion in denying defendant's motion to suppress his written statement. (1)

DEFENDANT'S RECORDED STATEMENT

 In addition to his two written statements and a videotaped statement, defendant also gave two
tape-recorded statements. On appeal, defendant asserts the trial court erred in failing to suppress his
tape-recorded statements because the police continued to question him after he unambiguously
invoked his right to terminate an interview. "If a statement is governed by Miranda (i.e., the suspect
is in custody), then a failure to cut off questioning after a suspect invokes his right to remain silent
violates his rights and renders any subsequently obtained statements inadmissible." Dowthitt v.
State, 931 S.W.2d 244, 257 (Tex. Crim. App. 1996). "A law enforcement officer may not continue
to question the suspect until the officer succeeds in persuading the suspect to change his mind and
talk." Id. "[A]n officer need not stop his questioning unless the suspect's invocation of rights is
unambiguous, and the officer is not required to clarify ambiguous remarks." Id. 

 Andrew Lopez, a Texas Ranger, decided he needed a supplemental interview with defendant
after having reviewed defendant's written statement and the videotaped statement. At the
suppression hearing, Lopez explained that the purpose of the supplemental interview was to obtain
defendant's assistance in locating the murder weapon, which the police believed defendant had
discarded at the site of an oil rig. At this time, defendant was in the custody of the Atascosa County
Sheriff's Department. Before the interview began, Lopez Mirandized defendant, who agreed to
waive his rights. This interview, which lasted about seven minutes, consisted of nothing more than
defendant identifying himself and explaining where he lived and with whom he lived. Lopez then
asked defendant if it bothered him to recall the incident and how did that make him feel. At this
point defendant abruptly stated, "I'm done." When asked, "You're done with what?", defendant
replied, "I'm done. I'm ready to go." Lopez terminated the interview and stopped the tape recorder. 
Lopez testified that defendant became very emotional and "didn't want to talk about it any more." 
Lopez said that while the recorder was turned off, he asked defendant if he was willing to take the
police to the rig site and show the officers where he had discarded the weapon, and defendant agreed
to accompany the officers. Lopez said he then asked "do you mind if we continue this interview?" 
According to Lopez, defendant agreed to continue the interview. As few as five minutes, but less
than twenty minutes, passed between the first and second recorded interviews. At the beginning of
the second interview, Lopez again Mirandized defendant, who again agreed to waive his rights. 
Before the interview begins, defendant agrees with Lopez that Lopez has turned the recorder back
on because defendant asked that it be turned on. Lopez confirms with defendant five times that
defendant agrees to continue the interview and be recorded. The second interview lasted
approximately thirty minutes, in which time defendant described the hammer he used to kill Evans,
he described how and where he disposed of the hammer, he discussed with Lopez a map of the rig
site where he discarded the hammer, and he agreed to accompany the police the next day to help
locate the hammer. Lopez then asked defendant if they could discuss defendant's prior statement,
and defendant agreed. Defendant said Evans came outside of her house because he was making
noise unloading pipe from his truck. When Evans said she was going to call the police, defendant
jumped over her fence into her yard and pulled out her telephone line. Lopez and defendant
continued to talk about how he pulled out the telephone line, when defendant abruptly said "It's all
in my statement. Can I go?" Lopez terminated the interview.

 In determining whether the authorities failed to comply with Miranda, we "afford almost
total deference to the trial court's rulings on questions of historical fact and on application of law
to fact questions that turn upon credibility and demeanor while we review de novo the trial court's
rulings on application of law to fact questions that do not turn upon credibility and demeanor." 
Ripkowski v. State, 61 S.W.3d 378, 381-82 (Tex. Crim. App. 2001) (citing Guzman v. State, 955
S.W.2d 85, 89 (Tex. Crim. App. 1997)). When the dispositive facts are uncontroverted and there
is no indication the trial court did not believe the testimony establishing these facts, we review the
trial court's denial of a motion to suppress under a de novo standard. State v. Ross, 32 S.W.3d 853,
858 (Tex. Crim. App. 2000). In this case, because only Lopez testified as to what transpired
between the two interviews and there is no indication the trial court did not believe his testimony that
the first interview stopped because defendant became emotional and the second interview began
because defendant wanted to continue, we review the trial court's denial under a de novo standard.
Defendant's statement that he was "done" and "ready to go" immediately followed Lopez's asking
how defendant felt and defendant becoming emotional. Within a few minutes of becoming
emotional, defendant agreed to accompany police to the rig site where he discarded the murder
weapon and he agreed to continue the interview. On this record, we conclude the trial court did not
abuse its discretion in denying defendant's motion to suppress the tape-recorded interviews.

SUFFICIENCY OF THE EVIDENCE

 Defendant asserts the evidence is legally insufficient to support his conviction because the
State failed to corroborate the testimony of an accomplice witness. We do not reach this complaint
because defendant's statements in which he admitted killing Evans is legally sufficient evidence
from which a rational jury could have found defendant committed the charged offense. 


 Sandee Bryan Marion, Justice

DO NOT PUBLISH

1. In his third issue, defendant also asserts his written statement should not have been admitted because it was
used to improperly bolster the videotaped statement. Defendant did not raise this objection before the trial court;
therefore, this complaint was not preserved for our review.