SILER, Circuit Judge,
dissenting.
I respectfully dissent from the majority opinion finding that the Ohio Supreme *569 Court unreasonably applied clearly established federal law in deciding this case based on the evidence presented in the state court under 28 U.S.C. § 2254(b). Whether this court would rule otherwise is not the issue. Instead, we must look at State v. Dixon, 101 Ohio St.3d 328, 805 N.E.2d 1042 (2004), to see if it was contrary to 28 U.S.C. § 2254(b). As the majority indicates, the Ohio Supreme Court found that the second statement by Dixon to the officers on November 9, 1993, was admissible under the authority of Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).
Although Dixon has argued that the Ohio Supreme Court should have followed Missouri v. Seibert, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), I agree with the majority when it indicates that the Seibert decision was not binding upon the Ohio Supreme Court at the time it decided State v. Dixon. The Ohio Supreme Court rendered its opinion in Dixon on April 14, 2004, and denied reconsideration on June 9, 2004. Seibert was not decided by the United States Supreme Court until June 28, 2004. Nevertheless, we can review what Seibert said about Elstad.
The facts in this case resemble the facts in Elstad and Seibert, but are easily distinguished. In Elstad, the accused made an initial inculpatory statement without Miranda warnings at the time of his arrest at his home. His subsequent confession at the sheriff’s office one hour later after being advised of his Miranda rights was admissible. In Seibert, the accused was questioned first for 30 to 40 minutes without Miranda warnings. After admitting her guilt, Seibert was given a 20-minute break, after which the officers advised her of her Miranda rights, and she then admitted her guilt again. However, as stated above, the Ohio Supreme Court did not have the Seibert decision as evidence of clearly established federal law at the time of its decision in Dixon.
In our case, the officers at the time of the first interrogation on November 9 deliberately decided not to use the Miranda warnings, because they thought Dixon would invoke his right to silence. Later, at the second interrogation on November 9, circumstances had changed significantly. First, Dixon was initially arrested for forgery, not murder. At the time of the first interrogation, the officers knew of the disappearance of Hammer, the victim, but had not found the buried body. The first interview lasted approximately 45 minutes, and the police focused their questions on Hammer’s disappearance. Dixon denied knowledge of Hammer’s disappearance during that interrogation, but admitted the forgery of Hammer’s automobile title. Dixon, 805 N.E.2d at 1049. Also significant is that between the time of the first interview on November 9, which concluded at 3:30 p.m., and the second interview, which began at 7:30 p.m., the police found Hammer’s body. At the second interview, before being questioned, “Dixon volunteered that he had heard that police had found the body and asked whether Hoffner [co-defendant] was in custody.” Id. Dixon also said that he had talked to his attorney and wanted to tell the police what happened. The majority says that the trial judge found otherwise, but the Ohio Supreme Court found that he told this to the detectives questioning him. Id. at 1050. After being advised of his Miranda rights twice and signing a waiver-of-rights form, Dixon implicated himself in Hammer’s death. Id.
The Ohio Supreme Court correctly followed federal law. In Elstad, the Supreme Court emphasized the coercive effect of the initial interview without Miranda warnings. Thus, it said:
*570 There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect’s will and the uncertain consequences of disclosure of a “guilty secret” freely given in response to an unwarned but noncoercive question, as in this case.
Elstad, 470 U.S. at 312, 105 S.Ct. 1285. It went on to hold “that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion.” Id. at 314, 105 S.Ct. 1285. Obviously, the first statement of November 9 was not coercive. One might feel that the deliberate act by the officers in failing to advise Dixon of his Miranda rights on the first interview was an improper tactic. However, Justice O’Connor, the author of Elstad later declared in her dissent in Seibert that the state of mind of the police is irrelevant to the voluntariness of the suspect to abandon his rights. Seibert, 542 U.S. at 625, 124 S.Ct. 2601 (O’Connor, dissenting) (citing Moran v. Burbine, 475 U.S. 412, 423, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)).
It is my belief that these facts, including (1) the passage of time between the two interviews on November 9; (2) Dixon told the officers he had talked to his attorney and wanted to make a statement; and (3) circumstances had changed between the two interviews, that is, that the officers had found the body and the likely charge would be homicide not forgery, are sufficient to dissipate the taint of the initial interview of November 9. The Ohio Supreme Court followed Elstad in making this determination, and I would not find that it unreasonably applied Miranda or Elstad.
Although the majority also discusses the alleged erroneous burden of proof on Dixon to show that his confession was coerced, that issue was not certified to this court and has not been raised by Dixon.
Moreover, even if there was a Miranda violation, the admission of the “confession at trial is subject to harmless error analysis.” Arizona v. Fulminante, 499 U.S. 279, 303, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Under Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993), an error is harmless unless it “had [a] substantial and injurious effect or influence in determining the jury’s verdict.” Id. at 637, 113 S.Ct. 1710. Here, several witnesses established that Dixon stole Hammer’s car about the time of his disappearance. Even more damaging, however, was the testimony of Kirsten Wilkerson, Dixon’s girlfriend, who described in great detail the efforts of both Dixon and Hoffner, as well as her own participation, to kill Hammer and transport him to the burial site. Thus, the admission of Dixon’s statement to the police did not have a substantial and injurious effect upon the jury’s verdict.
I also respectfully disagree with the concurring opinion by my distinguished colleague in which he indicates that he not only concurs with the majority opinion on the Miranda issue, but that he would also grant the writ on the basis that Dixon received ineffective assistance of counsel during the mitigation phase of the trial.
Although the parties and the district court all agreed that AEDPA sets up the standard of review on this issue, and although no error was claimed either in the district court or in this court for failure to consider this under a de novo standard, the concurrence may be correct that AED-PA does not apply because the district court held an evidentiary hearing involving the testimony of several witnesses. With *571 out deciding which standard applies, however, I would affirm the district court under either the AEDPA standard or a de novo review for the reasons set out herein. Also, like the district court, I would find that under Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), Dixon has failed to show prejudice by the alleged deficient performance on the part of his counsel during the penalty phase of the trial. In determining prejudice, “a petitioner ‘need not show that counsel’s deficient conduct more likely than not altered the outcome of the ease,’ but only ‘that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.’ ” Williams v. Anderson, 460 F.3d 789, 801-02 (6th Cir.2006) (quoting Strickland, 466 U.S. at 687-88, 104 S.Ct. 2052). Moreover, “the prejudice question is Vhether there is a reasonable probability that, absent the errors, the sentencer — including an appellate court, to the extent it independently reweighs the evidence — would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.’ ” Smith v. Mitchell, 348 F.3d 177, 199 (6th Cir.2003) (quoting Strickland, 466 U.S. at 695, 104 S.Ct. 2052). During the mitigation phase, trial counsel only presented the testimony of Sally Ann Walters concerning the significance of a sentence of life without parole for 20 years or life without parole for 30 years and a certified copy of Dixon’s birth certificate to show his age. Nevertheless, counsel conducted a significant investigation through Gary Ericson, a licensed private investigator and mitigation specialist, and a psychologist, Dr. Christopher Layne.
Ericson prepared a 51-page mitigation report. He reviewed records detailing Dixon’s birth, juvenile, educational, employment and psychological histories. He offered information about Dixon’s family environment, including physical violence and emotional abuse from his father. He also investigated possible sexual abuse, which actually was inflicted by Dixon against a four-year-old child. Ericson found that Dixon had been committed to a juvenile facility and earned a GED there. He also had a positive adjustment in his placement with a foster family. Ericson also found that Dixon had raped his younger sister and started taking drugs at the age of thirteen. Ericson presented his report to trial counsel, who found that Dixon did not want it to be presented to the jury. Counsel said Dixon was upset about it and would go “ballistic in the courtroom if all this information was presented at a sentencing hearing.” The psychologist, Dr. Layne, had concluded before the trial that Dixon’s intelligence was low-normal. He also found that Dixon had a criminal personality, called an antisocial personality disorder. He told defense counsel that he would not be helpful if called as a witness, in view of his findings. He knew that Dixon’s medical records had indicated possible Reyes Syndrome as a child, but he did not find any symptoms of Reyes Syndrome. He also reasoned that Dixon did not exhibit any of the primary symptoms of brain damage. In view of this information, Dixon’s counsel strategically decided not to introduce the testimony of either Ericson or Layne.
Trial counsel have an obligation to conduct a full investigation of their client’s background in death penalty cases. Williams v. Taylor, 529 U.S. 362, 396, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The district court found that the failure to use Dr. Layne as a witness was not a deficient performance, because his testimony would not have helped Dixon. On the failure to call Ericson as a witness, the court found that there was no prejudice, because evidence of a poor childhood likely would not *572 have been sufficient to change a juror’s mind. The district court found that, had the defense tried to show that Dixon was a “good guy,” his previous conduct including the conviction for gross sexual imposition on a four-year-old child, “would surely have been introduced into evidence.”
Although the concurrence criticizes the fact that counsel did not speak with any of the witnesses who could have testified for Dixon, the mitigation report from Ericson was a very thorough product. The law does not require that each counsel discuss with all potential witnesses what his or her testimony is supposed to be, so long as someone explores it and counsel concludes that for strategic reasons the evidence should not be introduced. Even the concurring opinion agrees that Ericson’s mitigation report was a comprehensive review of Dixon’s background. The aggravating facts of the homicide and the burial of the victim while he was still alive was such a heinous crime that it would have been difficult to find anything to mitigate the crime unless the offender was insane or mentally retarded, which was not the case here.
This case is a companion to Hoffner v. Bradshaw, 622 F.3d 487 (6th Cir.2010), which recites additional facts from the trial. Because the majority and concurrence do not discuss the other issues under the certificate of appealability, I also do not. However, I find no merit in any of the other issues raised and would affirm the denial of the writ of habeas corpus by the district court.