STATE OF MAINE
CUMBERLAND, ss.

UNIFIED CRIMINAL DOCKET
No. CR –11-5349

TDW- Cum - 12/27/2011

STATE OF MAINE

v.

JEREMY CHAPPELLE,

Defendant

Defendant Jeremy Chappelle is charged with felony drug trafficking in cocaine base based on the inference that a person possessing more than 4 grams of cocaine base is trafficking in that substance. See 17-A M.R.S. §§ 1103(1-A), 1103(1-B)(3). Because the indictment alleges that Chappelle possessed more than 32 grams of cocaine base, the charge against him would, if proven, constitute Class A aggravated trafficking in cocaine base under 17-A M.R.S. § 1105-A(D).

A hearing on defendant's motion to suppress was held on December 1, 2011, and the parties thereafter submitted memoranda of law.

The court finds as follows:

On August 11, 2011 at approximately 9 pm MDEA Agent Andrew Hagerty received a telephone call from Jerry Goldsmith expressing concern for the welfare of his daughter Faith Goldsmith. Hagerty had previously spoke with Goldsmith and members of his family who had reported to him that Faith, who was over 18, had a heroin problem, was in a downward spiral, and was associating with drug dealers. On the evening of August 11 Jerry Goldsmith reported to Hagerty that Faith had called her parents and had alarmed them by making statements to the effect that "everyone's lives were in danger."

Goldsmith further reported that his wife Tammy had gone to Faith's apartment at 7 Juniper Ledge in Yarmouth to check on Faith and that Tammy was not answering her cell phone.

Hagerty called the Yarmouth Police Department and asked the dispatcher to send an officer to check on Faith's welfare and then he himself drove to the Juniper Ledge Apartments. He arrived shortly after two Yarmouth officers, Kevin Pedersen and Roger Moore, who were in uniform and had arrived almost simultaneously in separate marked police cruisers around 9:30 pm. When Hagerty arrived, Officer Moore had encountered Tammy Goldsmith and was talking to her outside the apartment complex. Hagerty approached Tammy, who told him that she had been talking to Faith outside the apartment building but that Faith had run away when she saw the Yarmouth police cruisers. In an effort to find Faith, Officers Pedersen and Moore then canvassed the outside of the apartment complex and Moore checked out a nearby convenience store.

At that point Hagerty and Faith's mother believed it was possible that Faith had re-entered the apartment complex through one of the various entrances and had gone to her apartment. Based on what he had been told by Faith's parents, Hagerty was concerned that Faith was in some danger. At that point he decided that the officers would check Faith's apartment, to which Faith's mother had a key.[1]

Faith's mother unlocked the apartment, let Pedersen and Hagerty in, and waited outside while Pedersen and Hagerty entered. The apartment, which was dark except for a television that was switched on, was a small one bedroom with two levels. Initially Hagerty and Pederson were using their flashlights to ascertain if Faith or anyone else was inside.

---

[1] The officers understood that Faith's mother had rented the apartment for her daughter.

On the lower level, they observed the defendant lying on an air mattress. Hagerty and Pedersen identified themselves and when the defendant stood up, they told him to sit back down and Pedersen patted him down for weapons. At this point Hagerty was still looking to see if Faith was present as well but soon concluded she was not there.

At that point Hagerty or Pedersen asked the male who he was and what he was doing in the apartment. The defendant identified himself as Jeremy Chappelle and said he was a friend of Faith's. Asked for identification, he produced a social security card, a high school identification card, and some kind of North Carolina health care identification card, all of which bore the name Jeremy Chappelle. By this time Officer Moore had joined Hagerty and Pedersen in the apartment.

At no time during their encounter in the apartment with defendant was defendant handcuffed or otherwise restrained. No weapons were displayed, and nothing was said to defendant that would have suggested to him that once he had identified himself and explained his presence in the apartment, he would not have been free to leave.

The defendant told the officers that he had been in the apartment for several hours, that he had only been in Maine for two days, and that he had been staying in a hotel until Faith picked him up there earlier that day. Asked whether he had any belongings, the defendant said he had left them at the hotel even though he also said he had checked out.

By this time Officer Moore had also entered Faith's apartment. He noticed a backpack with a black and white checkered pattern which drew his attention because it was one of the few things in the apartment besides the television, the air mattress, and a

3

chair. He asked the defendant if the backpack belonged to him, and the defendant responded in the negative.[2]

At that point Hagerty, noting that the apartment tenant was not present, told the defendant to leave the apartment, which he did. The officers continued looking around, found several crack pipes, and collected them. Officer Moore began searching the backpack and found some male clothing, a passport, and a pair of tennis shoes. Hefting the tennis shoes and noticing that one was heavier than the other, Moore looked further and found a plastic bag which contained what appeared to be a significant amount of cocaine base (also known as crack cocaine).[3]

The passport in the backpack included a photograph that resembled the man the officers had talked to earlier who had identified himself as Jeremy Chappelle. However, the passport was in a different name (Jordan Charon) and had a different date of birth. Thinking that the defendant had given them a false name and wanting to question him about the crack cocaine found in the backpack, Officers Pedersen and Moore left the apartment in search of the defendant. When they emerged from the apartment and got into Pedersen's cruiser, they observed the defendant leaning into a vehicle some distance away.

When the defendant saw the officers, he started running. The officers pursued defendant in their car. After running 25 or 30 yards, the defendant stopped, was ordered to the ground, was handcuffed, and was placed in Officer Pedersen's cruiser. While the defendant was in the cruiser, Officer Pedersen asked him several questions

---

[2] Based on the officers' testimony the court finds that it was clear to defendant which backpack Moore was asking about. Indeed, Hagerty remembered that Moore had displayed the backpack to defendant when he asked whether it belonged to defendant.

[3] Hagerty estimated the amount to be at least 3-4 ounces – more than 20 times the amount necessary to raise possession of crack cocaine to a Class B offense under Maine law. See 17-A M.R.S. § 1107-A(2).

4

relating to his identity.[4] The defendant was thereafter transported to the Yarmouth Police Department by Officer Pedersen. Although it appears that Officer Pedersen may have mentioned that drugs had been discovered in the backpack, he did not question defendant on that subject.

At the Yarmouth Police Department defendant, initially handcuffed, was placed in an interview room. There is a video recording of all the proceedings in the interview room, but no audio recording was made of the first two and a half minutes. During that time the video reveals some initial interchange between Officer Pedersen and the defendant, but it does not appear that any questioning took place and there was no testimony at the suppression hearing that any questioning took place in the interview room before the audio recording was turned on.

The audio recording was turned on at the two and a half minute mark. During the next five minutes officer Pedersen made various inquiries of the defendant relating to his education and his work in a barbershop in New York. Officer Pedersen also counted the amount of money ($446) defendant was carrying. Except possibly by asking defendant whether he was "in the game"– a question which elicited a negative response – Officer Pedersen did not ask any questions relating to the drugs found in the backpack. Officer Pedersen did make statements alluding to the drugs, telling defendant that he knew defendant was not someone who was importing drugs from Colombia but was just someone caught up in certain activities in Maine. However, defendant did not make any incriminating statements during the five or six minutes in which his conversation with Officer Pedersen was captured on the audio recording.

---

[4] As it turned out, he was in fact Jeremy Chappelle, as stated in the various forms of identification he had first produced. In a subsequent interview, he stated that he was using a friend's backpack when he came to Maine and that the passport happened to be in the backpack.

5

At the end of five or six minutes Hagerty entered the room, Pedersen left, and Hagerty gave defendant his Miranda warnings. Defendant stated that he understood his rights and was willing to talk. Shortly thereafter, in response to Hagerty's questions, defendant acknowledged that the backpack containing the crack cocaine was his and made some additional incriminating statements.

During defendant's interview by Hagerty, the handcuffs were removed. At no time did Pedersen or Hagerty engage in any behavior that could remotely be characterized as coercive. Defendant was offered something to drink and an opportunity to use the restroom. Both Hagerty and Pedersen were friendly throughout, and Hagerty told defendant he would not seize the cash found on defendant but would let him retain it. Moreover, although Hagerty told defendant near the end of the interview that he would have an opportunity to cooperate by providing information to federal officers, this was after defendant had acknowledged the backpack was his. Hagerty indicated that cooperation could be helpful but made no specific promises and emphasized that whether to cooperate was entirely up to the defendant.

In his motion to suppress defendant argues that the officers did not have authority to detain and question him, that they did not have a right to search the backpack, that he was questioned while in custody before he received Miranda warnings, and that any statements he made were involuntary. On all the issues except voluntariness the State has the burden of proof by a preponderance. On voluntariness, as set forth below, the State has the burden of proof beyond a reasonable doubt.

Initial Police Contact

The court finds that the officers had a right to enter the apartment, having been invited to do so by Faith's mother, who had a key, for a wellness check on Faith. Once

6

they encountered defendant, a person who was not the apartment tenant and who was unknown to them, they were entitled to question him as to his identity. Under the circumstances, the officers had a reasonable articulable basis to confront defendant and briefly question him as to his identity and how he came to be in the apartment.

However, the officers were not required to give defendant a Miranda warning before questioning him in Faith's apartment. A Miranda warning is required before questioning a suspect who is in custody, and the test of whether a defendant is in custody is whether a reasonable person in the defendant's position would have believed that he was under arrest or was constrained to a degree associated with formal arrest. State v. Michaud, 1998 ME 251 ¶ 4, 724 A.2d 1222, 1226.

No Miranda warning is required for an investigatory detention which falls short of an arrest. State v. Langlois, 2005 ME 3 ¶¶7-8, 10, 863 A.2d 913, 916. Under the specific facts of this case and considering the factors set forth in State v. Michaud, 1998 ME 251 ¶ 4, 724 A.2d at 1226, the court finds that during his interaction with the officers in Faith's apartment, the State has met its burden of showing that a reasonable person in Chappelle's position would not have believed he was constrained to a degree associated with formal arrest.

### Search of Backpack

The court concludes that defendant does not have standing to challenge the search of the backpack because he disclaimed ownership of the backpack. See, e.g., United States v. De Los Santos Ferrer, 999 F.2d 7, 9 (1st Cir. 1993).

7

Arrest of Defendant Outside Apartment

The court concludes that the officers' detention of defendant in the parking lot after they had discovered what they estimated to be at least 3-4 ounces of crack cocaine was not a more investigatory detention but constituted the equivalent of an arrest. However, the officers had probable cause to arrest and detain the defendant under the circumstances given their discovery of the cocaine in the backpack along with a passport picture that resembled defendant and other suspicious circumstances.[5]

The court also finds that once the defendant stopped running in the parking lot and was instructed to get on the ground and was handcuffed, a reasonable person in defendant's position would reasonably believed that he was under arrest or was constrained to a degree consistent with formal arrest. See State v. Michaud, 1998 ME 251 ¶ 4, 724 A.2d at 1226. This was confirmed when defendant, still handcuffed, was placed in Officer Pedersen's cruiser and transported to the Yarmouth Police Department and placed in an interview room. He was not given Miranda warnings until Agent Hagerty entered the interview room at the Yarmouth Police Department. There is no evidence that defendant made any volunteered statements while he was in Officer Pedersen's cruiser or at the Yarmouth Police Department before Agent Hagerty arrived. As a result, defendant's motion to suppress is granted as to any statements he made to Officer Pedersen in the cruiser and at the Yarmouth Police Department before he was given Miranda warnings.

---

[5] Although the passport photo resembled defendant to some degree, it was far from a perfect likeness. However, passport photos are often poor likenesses, and the initials of the individual named in the passport were the same as those of the name given by the defendant. It was also at least curious that defendant, who was older than high school age, had provided a high school ID. Finally, there was an inconsistency between defendant's statement that he had checked out of his hotel and his statement that he had nevertheless left his baggage at the hotel. All of this information contributed to probable cause to conclude that the backpack belonged to the defendant and that he could therefore be arrested for possession of crack cocaine.

8

Post-Miranda Statements

Defendant contends that his post-Miranda statements should also be suppressed on the theory that they were obtained only after defendant had made similar admissions while in custody and before he had received Miranda warnings. See Missouri v. Seibert, 542 U.S. 600 (2004). There are two problems with this argument. The first is that, on the suppression record before the court, there is no evidence that defendant made anything similar to the crucial admissions in this case – that the backpack was his, that he had obtained the crack cocaine in the backpack, and that he had brought the crack cocaine to Maine to sell it – before Agent Hagerty gave him Miranda warnings. Based on the evidence at the hearing and the recorded proceedings at the Yarmouth Police Department, the court finds that officer Pedersen had generally conveyed to defendant that the officers believed he was involved with drugs. Because there is no evidence that defendant made any incriminating statements in response, there is no basis to conclude that that his post-Miranda statements were made because he had already made similar admissions.

Even assuming that defendant made some incriminating statements before he received Miranda warnings, the second problem is that Seibert involved a situation where the police had intentionally adopted a strategy of questioning arrestees before giving them Miranda warnings in order to more easily extract the same admissions after subsequent Miranda warnings were given. See 542 U.S. at 604. No such situation is presented in this case. The absence of such a strategy may alone be sufficient to justify the admission of the post-Miranda statements made to Agent Hagerty. See Siebert, 542

9

U.S. at 622 (Kennedy, J. concurring)[6]; United States v. Jackson, 608 F.3d 100, 103-04 (1st Cir. 2010).

To the extent that further analysis is necessary, the effect of a subsequent Miranda warning when a suspect in custody has already made incriminating statements would appear to turn on several factors. Among those are the following: whether the initial failure to give Miranda warnings resulted from a good faith mistake, whether the post-Miranda questioning was a continuation of the pre-Miranda interview, and whether there was any coercion or other circumstances calculated to undermine the suspect's free will. See Oregon v. Elstad, 470 U.S. 298, 309, 318 (1985); Missouri v. Siebert, 542 U.S. at 612 n.4 (plurality opinion); id. at 617-18 (Breyer, J. concurring); United States v. Jackson, 608 F.3d at 103-04.

In this case, although the court has found that defendant was in custody for purposes of Miranda once he was handcuffed in the parking lot, Officer Pedersen testified that at the time he did not believe defendant had been placed under arrest but instead was being detained in order to clear up his identity. Given the fluid situation and the fact that Pedersen did not engage in any systematic questioning of defendant, the court finds that Pedersen's belief to this effect, although incorrect, was in good faith. Moreover, the post-Miranda questioning of the defendant was not merely a continuation of earlier questioning in that (1) the venue had changed from Pedersen's cruiser to the interview room, (2) Pedersen had been replaced by Hagerty, and (3) Hagerty, in questioning the defendant after giving him Miranda warnings, made no

---

[6] Justice Kennedy was the deciding vote in Siebert and he limited inadmissibility of post-Miranda statements to situations where a "two-step interrogation technique was used in a calculated way to undermine the Miranda warning." Id.

10

"you already told us"-type references to any prior statements defendant had made since his arrest.[7]

Finally, as set forth below, there was no coercion or other improper tactics that undermined defendant's free will in this case, and the State has proven that all of his statements were voluntary.

Voluntariness

Statements made by a defendant to law enforcement officers are only admissible in evidence if those statements were voluntary, and the State bears the burden of proof of establishing voluntariness beyond a reasonable doubt. E.g., State v. Coombs, 1998 ME 1 ¶ 10, 704 A.2d 387, 390. A defendant's statements are voluntary if they result from the free choice of a rational mind, are not the product of coercive police conduct, and if under all the circumstances, the admission of those statements at trial would be fundamentally fair. Id., 704 A.2d at 390-91.

In this case, as noted above, there was no coercion or other improper police tactics. Both Officer Pedersen and Agent Hagerty conversed with defendant in a friendly manner. Neither pressured him in any way. Defendant's statements to Agent Hagerty were made after he had been given proper Miranda warnings and had knowingly and voluntarily waived his Miranda rights. Throughout his interaction with Pedersen and Hagerty, defendant was never emotional or upset. Both he and the officers remained calm throughout all their discussions. Defendant was understandably

---

[7] Compare Missouri v. Siebert, 542 U.S. at 605, where on several occasions during her post-Miranda questioning the suspect was referred back to (and reminded of) the incriminating statements she had previously made. In the case, as noted above, there is no evidence that defendant made any incriminating pre-Miranda statements with respect to the drugs found in the backpack. Even if he had, there is no indication in the record that Hagerty knew of any such statements or had ever consulted with Pedersen to learn of any statements defendant may have made to Pedersen.

11

subdued, but he acted in a rational manner throughout the interview and freely chose to answer Hagerty's questions.

The court finds that defendant's statements to Agent Hagerty, as demonstrated by the video and audio recording offered in evidence by the State, resulted from the free choice of a rational mind, that the State has proven beyond a reasonable doubt that those statements were voluntary, and that the admission of those statements at trial would be fundamentally fair.

For the foregoing reasons, defendant's motion to suppress is granted as to any statements made by defendant from the time he was handcuffed in the parking lot until he was given his Miranda warnings at the Yarmouth Police Department. In all other respects, defendant's motion to suppress is denied.

Dated: December 27, 2011

Thomas D. Warren
Justice, Superior Court

12

STATE OF MAINE
   vs
JEREMY S CHAPPELLE                                    Docket No  CUMCD-CR-2011-05349
990 ANDERSON AVE. APT #5J WEST 164TH STREET
BRONX NY 10452-5642                                    **DOCKET RECORD**

DOB: 09/01/1988
Attorney: CHRISTOPHER LEDWICK              State's Attorney: STEPHANIE ANDERSON
          THE LEDWICK LAW FIRM
          PO BOX 884
          BRUNSWICK ME 04011
          APPOINTED 08/12/2011

Filing Document: CRIMINAL COMPLAINT          Major Case Type: FELONY (CLASS A,B,C)
Filing Date: 08/15/2011

## Charge(s)

1   AGGRAVATED TRAFFICKING OF SCHEDULED DRUGS   08/11/2011 YARMOUTH
Seq 9050   17-A  1105-A(1)(D)            Class A
   HAGERTY                    / MDE


## Docket Events:

08/15/2011 FILING DOCUMENT -  CRIMINAL COMPLAINT FILED ON 08/15/2011

08/15/2011 Charge(s): 1
           HEARING -  INITIAL APPEARANCE SCHEDULED FOR 08/15/2011 at 01:00 p.m. in Room No.  1

           NOTICE TO PARTIES/COUNSEL
08/17/2011 Charge(s): 1
           HEARING -  INITIAL APPEARANCE HELD ON 08/15/2011 at 01:00 p.m. in Room No.  1            ,
           PAUL E EGGERT , JUDGE
           DA:  KATHERINE TIERNEY
           TAPE 3068
08/17/2011 Charge(s): 1
           PLEA -  NO ANSWER ENTERED BY DEFENDANT ON 08/15/2011

08/17/2011 Charge(s): 1
           HEARING -  DISPOSITIONAL CONFERENCE SCHEDULED FOR 11/09/2011 at 01:00 p.m. in Room No.  7

08/17/2011 Charge(s): 1
           TRIAL -  JURY TRIAL SCHEDULED FOR 12/12/2011 at 08:30 a.m. in Room No.  11

           NOTICE TO PARTIES/COUNSEL
08/17/2011 BAIL BOND - $10,000.00 CASH BAIL BOND SET BY COURT ON 08/15/2011 at 01:00 p.m. in Room No.  1
           PAUL E EGGERT , JUDGE
           OR $50,000 S/S W/CONDS
08/17/2011 Charge(s): 1
           MOTION -  MOTION FOR APPOINTMENT OF CNSL FILED BY DEFENDANT ON 08/15/2011

08/17/2011 Charge(s): 1
           MOTION -  MOTION FOR APPOINTMENT OF CNSL GRANTED ON 08/15/2011
           PAUL E EGGERT , JUDGE
           Attorney: CHRISTOPHER LEDWICK
            CR_200                Page  1  of 3                   Printed on: 12/30/2011

COPY TO PARTIES/COUNSEL
08/17/2011 Party(s): JEREMY S CHAPPELLE
ATTORNEY - APPOINTED ORDERED ON 08/12/2011


Attorney: CHRISTOPHER LEDWICK
11/04/2011 NOTE - OTHER CASE NOTE ENTERED ON 11/04/2011


CASE MOVED TO 1:00 AT ATTY'S REQUEST. FAMILY TRAVELLING OUT OF STATE CAN ONLY BE HERE
THEN.
11/09/2011 Charge(s): 1
HEARING - DISPOSITIONAL CONFERENCE HELD ON 11/09/2011
JOYCE A WHEELER , JUSTICE
Attorney: CHRISTOPHER LEDWICK
DA: LEA-ANNE SUTTON
CONF HELD                                                          MOTION TO
SUPPRESS FILED, AND SCHEDULED TO 12-1-11
11/09/2011 Charge(s): 1
TRIAL - JURY TRIAL CONTINUED ON 11/09/2011
JOYCE A WHEELER , JUSTICE
NO JURY SELECTION 12-12-11
11/09/2011 Charge(s): 1
TRIAL - JURY TRIAL SCHEDULED FOR 01/09/2012 at 08:30 a.m. in Room No.  11


NOTICE TO PARTIES/COUNSEL
11/09/2011 Charge(s): 1
MOTION - MOTION TO SUPPRESS FILED BY DEFENDANT ON 11/09/2011


11/09/2011 Charge(s): 1
HEARING - MOTION TO SUPPRESS SCHEDULED FOR 12/01/2011 at 01:00 p.m. in Room No.  8


NOTICE  TO PARTIES/COUNSEL
11/14/2011 Charge(s): 1
SUPPLEMENTAL FILING - INDICTMENT FILED ON 11/10/2011
JAMES  TURCOTTE , ASSISTANT CLERK
11/14/2011 Charge(s): 1
HEARING - ARRAIGNMENT SCHEDULED FOR 12/01/2011 at 01:00 p.m. in Room No.  8


12/01/2011 Charge(s): 1
HEARING - MOTION TO SUPPRESS HELD ON 12/01/2011
THOMAS D WARREN , JUSTICE
Attorney: CHRISTOPHER LEDWICK
DA: LEA-ANNE SUTTON
Defendant Present in Court


TAPE# 3373 INDEX 5200-5458,5915-7141. TAPE#3376 INDEX 130-1345,1502-2354.  STATE'S WITNESS
1-KEVIN PEDERSEN YARMOUTH PD, 2- ROGER MOORE YARMOUTH PD,  3-ANDREW HAGERTY MDEA AGENT.
                                        STATE'S EXHIBITS: 1-POST-MIRANDA VIDEO
INTERVIEW OF DEFENDANT AT YARMOUTH PD, 2-PASSPORT PHOTO. AFTER VIEWING VIDEO, ATTY LEDWICK
TO FILE MEMO BY 12-9-11 AND ATTY SUTTON TO FILE MEMO BY 12-16-11.
12/01/2011 Charge(s): 1
HEARING - ARRAIGNMENT HELD ON 12/01/2011
THOMAS D WARREN , JUSTICE
Attorney: CHRISTOPHER LEDWICK