**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0958n.06

No. 10-1021

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Aug 29, 2012*

LEONARD GREEN, Clerk

CORDALL NEAL, )
)
    Petitioner-Appellant, )
)
v. )
)
RAYMOND BOOKER, Warden, )
)
    Respondent-Appellee. )

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

Before: DAUGHTREY, COOK, and KETHLEDGE, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. Petitioner Cordall Neal is a Michigan state prisoner serving a life sentence following his convictions of first-degree murder and related felonious-weapons charges. His state appeals and his collateral litigation in state court were unsuccessful, and Neal filed a petition for habeas corpus in federal court raising various claims, two of which the district court certified for appeal after denying habeas relief. Those claims challenge the state trial court's refusal (1) to suppress Neal's post-*Miranda* statements to the police and (2) to give a jury instruction on self-defense. We conclude, as did the district court, that the denial of the petitioner's pre-trial motion to suppress was, at most, harmless error and that the record fails to support a self-defense theory that would have necessitated an instruction on that point of law. We therefore affirm the district court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Neal was charged with first-degree murder in connection with the shooting of Marcus Newsom. *People v. Neal*, No. 246031, 2004 WL 2049768 (Mich. Ct. App. Sept. 14, 2004). The prosecutor's theory was that Neal aided and abetted his cousin and two uncles, who shot Newsom in the mistaken belief that he was Jamal Bradley. The defense argued that Neal had no knowledge of his relatives' intent to shoot Bradley and should, at most, have been found guilty of being an accessory after the fact for assisting them in their efforts to flee from the crime scene.

The Michigan Court of Appeals summarized the record as follows:

[Neal] left his residence in Clinton Township and drove with relatives to Adrian, Michigan to visit his son. [Neal] knew that his relatives carried weapons, although he denied seeing any weapons that evening. He also knew that his relatives were looking for a particular individual named Jamal Bradley, who had allegedly stolen money from their parents, [Neal]'s grandparents. [Neal] testified that he feared Bradley because he had heard rumors that Bradley was threatening to shoot him. Yet, he knew that his relatives were seeking Bradley out to determine a repayment schedule for the money he had taken from their parents. [Neal] testified that he drove to the home of his son, but did not stop there because he believed that his ex-girlfriend had a guest over.

[Neal] was driving a van with his cousin seated in the front passenger seat and his two uncles seated in the back seat. [Neal] came upon a vehicle that he believed was driven by Bradley. He was instructed by his relatives to pull up alongside the vehicle because they wanted to talk to Bradley. He complied and heard a gunshot followed by "all types of gunshots." [Neal] drove off because he "just wanted to assist 'em [sic] to get away." [Neal] testified that there was no plan or discussion to shoot the driver of the vehicle. The van driven by [Neal] was stopped a short distance from the shooting. The weapons used by the occupants had been discarded between

the location of the shooting and the location of the traffic stop. At the police station, [Neal] learned that Bradley was not driving the vehicle, and Marcus Newsom had been shot and killed instead.

On cross-examination, [Neal] acknowledged that he had three children who lived in the area, but he only attempted to see his son. He acknowledged that there was nothing to preclude him from stopping in to visit his son. [Neal] also acknowledged that he made a telephone call to try and locate Bradley when he got into town. Although he had testified that he was "afraid" of Bradley, [Neal] nonetheless tried to locate Bradley when accompanied by his relatives whom he assumed were carrying guns. [Neal] could not definitively testify to where the first gunshot came from. After the gunshot, [Neal] "stopped for a second, then the back swingin' doors comes (sic) open, gunshots, I hear a bunch of gunshots then." [Neal] knew that his front passenger, his cousin, was shooting, but he did not know, but guessed, that his uncles were also shooting.

Witness Carolyn Sue McMillian testified that [Neal] telephoned her home on the evening of the shooting and asked her about the whereabouts of Bradley. The day after the shooting, McMillian received a telephone call from [Neal]. [Neal] apologized to McMillian about the shooting and advised her that the gunshots were not meant for Newsom.

*Id*. at *1-*2.

After the van was stopped by police, Neal and the other three occupants were arrested and taken to police headquarters, where they were put in four separate rooms for interrogation. Neal spent the next two hours in the company of Deputy Nathan Adams, waiting for the officer in charge of the case, Detective Randal Labarr, to come and question him. Neal and Adams both testified that during that time, the conversation was casual: Adams said that Neal did most of the talking, asking occasionally when he could go home. Adams explained that it would depend on what developed from interrogation, but that they would have to wait for Labarr before questioning began. Adams later said that he and Neal

talked about "children, fishing, beer, parties."  In the course of the conversation, Neal did discuss the reason for his trip to Adrian and where he and the family members had driven earlier that night, but the record indicates that he did not make any incriminating statements to Adams before he was given his *Miranda* rights.  That occurred after Detective Labarr joined them, when Neal was formally read his rights, acknowledged that he understood them, and signed a written waiver.  He repeated parts of the discussion he had already had with Adams and then gave Labarr his version of the events surrounding the shooting, claiming that he had no involvement in Newsom's murder, but admitting that he had facilitated the escape from the crime scene.  At the end of this oral statement, Neal asked if he could give a written statement in his own words, and Adams wrote it out for him, taking up some three-and-a-half pages in large block print.  He later reiterated the entire statement on audio-tape, under questioning by a third officer, Detective Michael Shadbolt.

In all of these statements to police, Neal maintained his innocence, contending that he had no knowledge that the other occupants of his van intended to shoot the victim under the mistaken idea that he was Jamal Bradley.  At trial, Neal testified to the circumstances surrounding the statements, maintaining that he fully cooperated with the police because he was innocent and had "nothin' to hide."  The only information that Neal apparently failed to share with the interrogating officers was the names of the other people in his van, but he acknowledged that they were members of his family and were known to be armed.  Moreover, the other three were already in police custody, and their identity was

presumably known. At trial, Neal's lawyer described his client as "cooperating freely, intelligently and of his own free will in giving [the officers his] statement."

Nevertheless, the petitioner argued on direct appeal in state court, as he does here, that the written and oral statements that he gave after signing the *Miranda* waiver should have been suppressed as the "fruit of the poisonous tree," because they were tainted by statements elicited before the warnings were given and the waiver signed. Neal cited as support *Missouri v. Seibert*, 542 U.S. 600 (2004), in which a plurality of the Supreme Court justices held that *Miranda* warnings given mid-way through an interrogation, after an accused had made unwarned but incriminating statements, could be considered ineffective, thus making any subsequent confession inadmissible. *Id*. at 615 (listing five factors pertinent to a review of a delayed warning's effectiveness). Concurring in the judgment, Justice Kennedy nevertheless proposed a narrower ruling: that a delayed warning would not make a subsequent confession invalid unless "the two-step interrogation technique," like that utilized in Seibert's case, was shown to have been deliberate, *i.e.*, "used in a calculated way to undermine the *Miranda* warning." *Id*. at 622 (Kennedy, J., concurring).

Reviewing this argument, made for the first time on direct appeal, the Michigan Court of Appeals rejected it, finding Neal's reliance on *Seibert* "misplaced." *People v. Neal*, 2004 WL 2049768, at *2, n.3. The court observed that the issue had not been raised below; that the record therefore did not contain any evidence from the defendant to refute

credible testimony by Deputy Adams that Neal was not interrogated, as such, prior to signing the *Miranda* waiver; and that he did not make what could be considered a confession while they awaited the arrival of Detective Labarr. *Id*.

The Michigan Court of Appeals also rejected Neal's contention that the trial court erred in declining to give a jury instruction on self-defense, finding as a matter of state law that his "testimony d[id] not support the theory of self defense." *Id*. at *3. That testimony was that Neal "drove the vehicle with his cousin and two uncles as passengers . . ." but "did not perform any act in defense of himself or others." *Id*. Indeed, the evidence at trial established that Marcus Newsom – a victim of misidentification as well as of homicide – was unarmed at the time he was suddenly shot and killed.

Unsuccessful in his state-court litigation, Neal filed the instant petition for habeas corpus in federal district court, raising six claims for relief. The district court denied relief on all of them but certified an appeal on the two issues we now review. As to the *Seibert* claim, the district court set out the ruling of the Michigan court without explicitly adopting it and, instead, cautiously applied the five factors in *Seibert* to Neal's detention and interrogation, finding that "Petitioner's incriminating post-warnings statements were made knowingly, intelligently, and voluntarily." The record, according to the district court, therefore established that the warnings were effective when made and that "the state court rulings that the Petitioner's statements were admissible were objectively reasonable decisions." The district court further held that "even if the admission of the Petitioner's

statements constituted error, the error was harmless," based on the strength of the evidence introduced at trial, even without Neal's post-arrest statements and his trial testimony to the same effect. The court summarized the convicting evidence, concluding that Neal was proven guilty of "aid[ing] and abet[ting] the shooters, knowing that they intended to shoot and kill someone."

The district court further found that "[t]here was insufficient evidence for a reasonable jury to find that Petitioner acted in self defense . . . [and t]herefore Petitioner had no right to a jury instruction on self defense." Thus, the district court said, "the state appellate court's conclusion did not result in an unreasonable application of Supreme Court precedent."

## ANALYSIS

When "reviewing a district court's denial of a petition for a writ of habeas corpus, this Court reviews findings of facts for clear error and questions of law *de novo*." *Stone v. Moore*, 644 F.3d 342, 345 (6th Cir. 2011) (citing *Haliym v. Mitchell*, 492 F.3d 680, 689 (6th Cir. 2007)). Twenty-eight U.S.C. § 2254(d) establishes the governing standard for addressing a habeas petition. It provides that the writ may be granted only when the state court's adjudication on the merits "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A decision is "contrary to" clearly established federal law if the court "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). A decision is "an unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. In evaluating whether a state-court decision involved an "unreasonable application" of federal law, a habeas court must not focus on whether the state court decision was erroneous or incorrect, but whether it was objectively unreasonable. *See id*. at 409-11.

**Admissibility of Neal's Statements to Police**

The initial question under *Williams v. Taylor*, as it applies to Neal's case, is whether the state court's ruling on the admissibility of his post-arrest statements to police was "contrary to" or an "unreasonable application of" clearly established federal law. The Michigan Court of Appeals specifically found that:

> In the present case, two police officers testified regarding their conversation with defendant and his waiver of his Miranda rights. The testimony indicated that defendant was engaged in minor conversation and *Miranda* rights were administered when the topic of the conversation led to the shooting incident. The trial court concluded that the testimony of the officers was credible, and defendant did not present any testimony to contradict the officers. Under the circumstances, we cannot conclude that the trial court's factual conclusions were clearly erroneous.

*People v. Neal*, 2004 WL 2049768 at *2 (citation omitted).

The Michigan court held that *Seibert* was inapplicable to the facts in *Neal*, finding instead that there was only "minor conversation" prior to Neal's valid waiver of his rights under *Miranda*. *Id*. The district court went one step farther and, helpfully, provided us with an analysis under both the five-factor test provided by the plurality opinion in *Seibert* and under Justice Kennedy's "deliberate strategy" test, *i.e.*, whether the two-step interrogation technique "was used in a calculated way to undermine the *Miranda* warning." *Seibert*, 540 U.S. at 622 (Kennedy, J., concurring). The district court found from Neal's own testimony that he had been informed of his rights and knew that he could remain silent, but made the statements at issue voluntarily because he was innocent and had nothing to hide. The district court concluded that Neal's testimony was sufficient to show that the warnings he received functioned effectively and that Adams's testimony, as credited by the state courts, proved that "there was no deliberate strategy to violate *Miranda*," making the post-*Miranda* statements admissible.

We are not prepared to say that the Michigan court's decision was "contrary to" or an "unreasonable application" of *Miranda*, principally because we conclude, as did the district court, that any error by the state courts in that regard was harmless, at most. In reaching this conclusion, the district court declined to consider Neal's testimony in deciding that the evidence of guilt was constitutionally sufficient to uphold the conviction in the absence of testimony recounting the statements Neal gave to police. We, on the other

hand, are inclined to include Neal's testimony in reviewing the proof of guilt. That testimony – as defense counsel pointed out to the jury – was almost completely consistent with his post-arrest statements and, thus, suppressing them at trial would not have changed the substance of the evidence before the jury.

There are, of course, circumstances in which the "poisonous fruit" doctrine may prevent the government's reliance on a defendant's trial testimony that follows the introduction of an unlawfully obtained pre-trial confession. *See generally Harrison v. United States*, 392 U.S. 219 (1968). Neal invokes the doctrine in this case, contending that under *Harrison*, the prosecution cannot use a defendant's testimony to establish the harmlessness of an error if the defendant testifies after his statements to police were wrongfully admitted. However, we read *Harrison* to establish a much narrower principle: the prosecution cannot use former trial testimony in a new trial where the petitioner was "impelled" by the prosecution's wrongful use of his illegally obtained confessions to testify at the original trial. *Id*. at 223-25. Harrison had not planned to testify – indeed, his attorney told the jury in opening argument that his client would not take the stand – but once the confessions were introduced over his objection, he took the stand in an effort to counteract them.

Here, by contrast, Neal's testimony was consistent with his earlier statements to police. In both instances, Neal sought to exculpate himself from liability, contending repeatedly that he had no knowledge that his relatives were going to shoot Newsom. We

therefore conclude that Neal was not compelled to testify to rebut the testimony admitted in his statements but, instead, sought to gain credibility by testifying consistently with his earlier statements to emphasize to the jury that he was not, in fact, guilty. It follows that any constitutional error in admitting the earlier statements was harmless.[1]

**Lack of Jury Instruction on Self-Defense**

In his second claim, Neal alleges that the state trial court failed to instruct the jury to consider his theory of self-defense despite the fact that sufficient evidence supported such an instruction. We note first that the Michigan Court of Appeals was only partly correct in ruling that a self-defense instruction was unnecessary because Neal did not perform an act in defense of himself or others. *See People v. Neal*, 2004 WL 2049768, at *3. Neal's claim of self-defense was vicarious, based on a potential claim held by the *shooters*, not by Neal himself, who was prosecuted on a theory of aiding and abetting and not as a principal. Michigan recognizes self-defense as a complete defense to an otherwise intentional homicide, *see People v. Riddle*, 649 N.W.2d 30, 38-39 (Mich. 2002), so there would have been no crime for Neal to have aided and abetted had the shooters truly acted in self-defense. Moreover, the Michigan Supreme Court has recognized this relationship between aiding-and-abetting charges and self-defense instructions. *See, e.g., People v. Johnson*, 323 N.W.2d 439, 459 (Mich. 1982) (holding that "if an attack by a

---

[1]We have addressed this same question and reached the same result in our unpublished opinion in *Burks v. Perini*, 810 F.2d 199, at *1 (6th Cir. 1986) (table) (per curiam) (determining that defendant would have chosen to testify whether or not the confession was admitted and, thus, any constitutional error was harmless).

principal is justified by self-defense both the principal and the aider and abettor are relieved from liability").

This misconception of the issue by the Michigan Court of Appeals matters little to Neal's habeas claim, however, for just as there was no evidence that he acted in defense of himself or others, there was likewise no proof that the others in the van acted in their own defense, principally because the evidence established that the victim was not armed. Although the state court could have analyzed this issue in broader terms, we cannot say that they reached a result that is contrary to or a misapplication of federal law, which requires an instruction on self-defense only "when the instruction has been requested and there is sufficient evidence to support such a charge." *Taylor v. Withrow*, 288 F.3d 846, 851 (6th Cir. 2002). The fact that after the shooting, a bullet hole was found in the side of Neal's van counts for very little, because Neal offered no proof of how or when it came to be there. Finally, Neal's failure to adduce any evidence suggesting that the passengers in his car had an honest and reasonable belief of the danger of serious bodily harm or death, *see People v. Kurr*, 654 N.W.2d 651, 653 (Mich. Ct. App. 2002), means that there was not evidence "sufficient for a reasonable jury to find in his favor," as required by federal law. *Mathews v. United States*, 485 U.S. 58, 63 (1988).

## CONCLUSION

For the reasons set out above, we AFFIRM the district court's judgment.