Filed 8/29/13  P. v. Vermeulen CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B238019 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA074799) |
| v. | |
| ANDREW LEO VERMEULEN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura F. Priver, Judge.  Affirmed.

Juliana Drous, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Mary Sanchez and David Zarmi, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Andrew Leo Vermeulen appeals from the judgment following a jury trial that resulted in his conviction of first degree residential burglary (Pen. Code, § 459)[1] and true findings by the trial court that he had suffered six prior strikes under the "Three Strikes" law (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), three of which also constituted prior serious felony convictions (§ 667, subd. (a)(1)). He was sentenced to prison for 25 years to life under the Three Strikes law, plus 15 years, or 5 years for each of the three prior felony enhancements.

Defendant contends the trial court erred in refusing to suppress his post-*Miranda*[2] statement, which was the product of an impermissible two-step interrogation technique aimed at undermining the *Miranda* warning. He also contends that, although the trial court struck one of his seven strikes, the court abused its discretion by refusing to strike the other six strikes pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*). He further contends his sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution, because his sentence for the nonviolent crime of burglary is greater than the punishment for the crime of murder, which is 25 years to life.

We affirm the judgment. The record is barren of any evidence that defendant's post-*Miranda* statement was the product of a deliberate "ask first and advise later" interrogation technique condemned in *Missouri v. Seibert* (2004) 542 U.S. 600 (*Seibert*). The trial court did not abuse its discretion in refusing to strike the remaining six strikes. His Three Strikes sentence of 25 years to life, plus 15 years, or a mandatory 5 years for each of three prior serious felony enhancements, does not violate the Eighth Amendment.

---

[1]     All further section references are to the Penal Code unless otherwise indicated.

[2]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

## BACKGROUND

On October 7, 2008, sometime after 5:20 p.m., Lisa Carter arrived at the house she shared with her two sons on Atlantic Boulevard in Alhambra, which she had rented since 2002 from Julia Foxman, the owner. Defendant was inside an unknown car parked in her driveway. When asked if she could help him, defendant asked for Foxman twice. Carter responded both times Foxman did not live there.

Carter noticed the gate in her fence was ajar and a sprinkled trail of coins led from behind the gate to the car. When asked if he had broken into the house, defendant replied, "No." She said she was calling the police, wrote down the car's license plate number, and called "911." Defendant drove away.

Upon examining her home's exterior, Carter saw a rear bedroom window was open and its screen was missing. Once inside, she noticed her laptop computer and the laptop and a digital camera belonging to one son along with the money jar belonging to her other son were missing. The items had been located in different rooms. She did not give anyone permission to take the items.

The Alhambra police traced the car license plate number to defendant. Carter identified him from a photographic lineup. The police contacted his parole officer, Donee Hazama, who had defendant come to the parole building where Alhambra Detective Wilfredo Ruiz questioned him about the incident in Alhambra and then arrested him.

Defendant was medically examined and then booked at the station. The detective then interviewed him for about 10 to 15 minutes during which he asked five questions. Asked if he knew Carter, defendant denied he did but stated he knew Foxman. He had cut her lawn in the 1980's and 1990's and believed she lived there. When asked how he got inside, he replied he climbed in an open window. In response to two further inquiries, he stated he had taken the items from one or two rooms and a front den and that no one was home at the time. The detective's last question was where had he gone after leaving the house. He stated he drove west on the 10 Freeway to Los Angeles, exited on 4th Street, and went to 6th Street.

At the time of the incident, defendant was wearing a geo-positioning satellite (GPS) device attached to his ankle on July 1, 2008. The GPS device, which recorded movements in one-minute increments, reflected he had moved around at Carter's house during the eight minutes he was there.

## DISCUSSION

### 1. Refusal to Suppress Post-*Miranda* Statement Not Error

While at the parole office, Detective Ruiz questioned defendant regarding the Carter incident without giving *Miranda* admonishments. In response, he made incriminating statements. Later, at the police station, the detective advised him pursuant to *Miranda* before questioning, which elicited inculpatory statements. The trial court suppressed the pre-*Miranda* statements but refused to suppress the post-*Miranda* statements. Defendant contends such refusal constitutes reversible error, because his post-*Miranda* statements were the product of a two-step interrogation technique designed to circumvent *Miranda* which was condemned in *Seibert*. We disagree.

#### a. Suppression proceedings

In his motion to suppress evidence, defendant sought suppression of both the pre-*Miranda* and the post-*Miranda* statements.[3] At the hearing, the prosecution presented evidence regarding the circumstances under which both statements were obtained.

##### i. Pre-*Miranda* statement

On October 8, 2008, defendant was subject to parole search and seizure conditions. Agent Hazama advised Detective Ruiz of this fact. Defendant was in the parole building lobby when investigator Edward Elizalde and Sergeant Kean Oda, both in plain clothes, identified themselves and asked him to go outside. Investigator Elizalde, whose gun was not visible, patted down defendant and handcuffed him for officer safety. He was not told he was under arrest.

Within a minute, Agent Hazama and Detectives Ruiz and Eddie Rodriguez arrived. Detective Ruiz led defendant by his elbow through a side door and removed the

---

[3]    The written motion is not in the record.

4

handcuffs once they were in Agent Hazama's office. Detective Ruiz, who already had identified himself, told defendant he wanted to question him about an incident in Alhambra and advised him that he was not under arrest and was free to leave. The office door remained open, and no weapons were displayed. Detective Ruiz had spoken cordially without yelling or threatening. During the interview, defendant nodded off, appeared tired, and showed some signs of narcotic use.

When asked where he was the previous day, defendant stated he had a fight with his girlfriend and drove to downtown Los Angeles to buy narcotics. He denied being in Alhambra. Detective Ruiz responded that he did not think he was telling "the whole truth" and that they had his GPS tracking unit information.

The detective then asked if defendant had parked in a driveway of a house in Alhambra. Lowering his head, defendant said, "Sir, I messed up." Asked if he knew anyone living at the house, defendant responded he thought Foxman lived there. He used to work at the house and mowed her lawn in the 1980's and 1990's. The detective then asked how he got in and from where had he taken the items. Defendant stated he entered through an open window and he had taken the items from two bedrooms and a den in the front of the house.

Detective Ruiz told defendant he was under arrest for residential burglary. After placing defendant back in handcuffs, he drove defendant in his police car to the police station where defendant was examined medically and booked.

### ii. Post-*Miranda* statement

Detective Ruiz then gave defendant a *Miranda* admonition. Asked if he understood his rights, defendant responded, "Yeah." Defendant signed a form indicating he understood his rights. He appeared to understand his rights and although there was no express waiver of rights, he agreed to speak. This second interview lasted no more than five minutes.

Asked if he knew anyone who lived in the house, defendant stated he used to cut the lawn there in the 1980's and 1990's. In response to further inquiries, defendant stated he entered through an open back window; he took items from one or two rooms and from

5

another room toward the den near the front of the house; and there was no one else inside. When asked what route he took upon leaving, defendant replied he drove straight to the intersection of 6th Street and Julian.

Detective Ruiz then asked, without threat, if defendant wanted to write an apology letter, stressing his decision would be completely voluntary. Defendant responded in the affirmative.

Defendant addressed his letter "Dear Mrs. Carter" and wrote: "I'm so sorry for doing what I did to you. It was not intentional. My mind was so screwed up on drugs. I was doing so good and I was going to get married. I made a crucial mistake. If I could pay you back 10 times over I would. I hope that you would forgive me. I hope that you would understand that it was the drugs talking. I was . . . waiting for bed space in rehab next week. I'm sorry."

### iii. Rulings on both statements

The trial court's tentative ruling was to grant the motion to suppress the pre-*Miranda* statements and deny the motion as to the post-*Miranda* statements. The court reasoned the pre-*Miranda* investigation was focused entirely on defendant, who had been handcuffed before being released from handcuffs, and the interview was at the parole office. In contrast, the court found the post-*Miranda* statements appeared trustworthy, because of the lapse of time from the initial statement; defendant had been checked medically; he was advised of his constitutional rights; and his responses appeared appropriate to the questions.

After hearing extensive argument, the trial court ruled the pre-*Miranda* statements were inadmissible, because the totality of the circumstances established defendant should have been advised of his *Miranda* rights before questioning. The court explained the police knew defendant's tracking device had been at Carter's house and Carter had identified him. The police therefore had focused on defendant with the objective to obtain an incriminating statement.

The court found the post-*Miranda* statements were admissible based on the totality of the circumstances and because defendant had not been coerced into making his pre-

6

*Miranda* statement. These statements were made only after defendant had been advised under *Miranda*; he had indicated his understanding of his *Miranda* rights; and he impliedly waived his rights, as especially reflected by his voluntary apology letter. The court also found sufficient attenuation existed, because the statements were made 50 minutes apart at different locations; and defendant had been medically examined and booked, which alerted him he was the focus of the investigation.

### b. Post-*Miranda* statement not the product of impermissible two-step interrogation

Defendant contends his post-*Miranda* statement violated *Seibert*, because it was the product of an impermissible two-step interrogation procedure calculated to circumvent the protections of *Miranda*. His reliance on *Seibert* is misplaced.

*Seibert* is inapplicable where, as here, "there is no evidence . . . the officers were 'following a policy of disregarding the teaching of *Miranda.*' [Citation.]" (*People v. Scott* (2011) 52 Cal.4th 452, 478, cert. den. *sub num. Scott v. California* (2012) __ U.S. __ [132 S.Ct. 1103].)

Statements elicited without *Miranda* compliance may not be admitted for certain purposes in a criminal trial. (*Miranda, supra,* 384 U.S. at p. 492.) *Miranda* mandates that before interrogation, an individual "taken into custody or otherwise deprived of his freedom of action in any significant way" must "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." (*Id.* at p. 444.)

In *Oregon v. Elstad* (1985) 470 U.S. 298, 307 (*Elstad*), the Supreme Court held the "[f]ailure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary within the meaning of the Fifth Amendment [of the United States Constitution] must nevertheless be excluded from evidence under *Miranda.*" The court also held "[i]t is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and

7

informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." (*Id.* at p. 309.)

This principle was embraced by the plurality in *Seibert*. "*Elstad* held that 'a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings.' [Citation.] In a sequential confession case, clarity is served if the later confession is approached by asking whether in the circumstances the Miranda warnings given could reasonably be found effective. If yes, a court can take up the standard issues of voluntary waiver and voluntary statement; if no, the subsequent statement is inadmissible for want of adequate *Miranda* warnings, because the earlier and later statements are realistically seen as parts of a single, unwarned sequence of questioning." (*Seibert*, *supra*, 542 U.S. at p. 612, fn. 4.)

Defendant's pre-*Miranda* statement was voluntary and not the result of deceptive or coercive interrogation techniques.[4] During the interview, Detective Ruiz did not yell or threaten; rather, he spoke cordially. No weapons were displayed. Defendant agreed to speak with the detective. Although defendant had been handcuffed for officer safety, the detective removed the handcuffs once inside the office, and the door remained open. He advised defendant he was not under arrest and was free to leave.

His post-*Miranda* statement was not the product of a deliberate interrogation tactic of "ask first and advise later" in violation of *Seibert*. In *Seibert*, the court condemned a two-step interrogation technique consisting of "a police protocol for custodial interrogation that calls for giving no warnings of the rights to silence and counsel until

---

**4** An involuntary or coerced statement is a statement "obtained by physical or psychological coercion, by promises of leniency or benefit, or when the 'totality of circumstances' indicates the confession was not a product of the defendant's 'free and rational choice.' [Citations.]" (*People v. Cahill* (1993) 5 Cal.4th 478, 482, fn. 1.)

8

interrogation has produced a confession . . . . [T]he interrogating officer follows it with *Miranda* warnings and then leads the suspect to cover the same ground a second time. . . . Because this midstream recitation of warnings after interrogation and unwarned confession could not effectively comply with *Miranda*'s constitutional requirement, [the Court held] a statement repeated after a warning in such circumstances is inadmissible." (*Seibert, supra,* 542 U.S. at p. 604 (plur. opn. of Souter, J.).) This technique "reveal[ed] a police strategy adapted to undermine the *Miranda* warnings." (*Id.* at p. 616 (plur. opn. of Souter, J.); see also *id.* at pp. 618, 620 (conc. opn. of Kennedy, J.).)

In *Seibert*, the interrogating officer "testified that he made a 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer . . . already provided once.' . . . He acknowledged that Seibert's ultimate statement was 'largely a repeat of information . . . obtained' prior to the warning." (*Seibert, supra,* 542 U.S. at pp. 605-606 (plur. opn. of Souter, J.), citation omitted.) Because the *Seibert* court found the giving of *Miranda* warnings wholly inadequate, there was no occasion to proceed with assessing the actual voluntariness of the postwarning statement. (*Id*. at p. 617, fn. 8.)

No evidence was presented that Detective Ruiz deliberately withheld the *Miranda* advisements in order to coerce a confession or admissions from defendant during the initial interview, or that the *Miranda* warnings were later given "midstream" as part of a "coordinated and continuing interrogation" to get defendant to repeat a pre-*Miranda* statement. (*Seibert, supra,* 542 U.S. at pp. 613, 615 (plur. opn. of Souter, J.).) Rather, the circumstances indicate, "a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine [defendant's] ability to exercise his free will." (*Elstad, supra,* 470 U.S. at p. 309.) Both interviews covered some of the same ground, but they were not co-extensive.

Moreover, although the same detective conducted the pre-*Miranda* and post-*Miranda* interviews, they were separated by ample time and different location, unlike *Seibert* where the two interviews were conducted in the same location and separated only

9

by a 15- or 20-minute interval.  (*Seibert, supra*, 542 U.S. at p. 616 (plur. opn. of Souter, J.).)  It was stipulated 50 minutes elapsed between the interviews in this case, and it is uncontroverted the interviews were at different locations.  "[A] substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn."  (*Id.* at p. 622 (conc. opn. of Kennedy, J.).)

### 2.  Refusal to Strike Remaining Six Strikes Not Abuse

Defendant contends the trial court abused its discretion in refusing to strike the remaining six of his seven prior strikes, which would have taken him outside the Three Strikes sentencing scheme.  We find no abuse of discretion.

#### a.  Procedural background

The information alleged defendant had suffered seven strikes under the Three Strikes law.  Defendant allegedly was convicted on June 27, 1997, of four burglary (§ 459) counts and an attempted burglary (§§ 664, 459) count in Los Angeles Superior Court case No. GA032558.  On August 31, 2001, he allegedly was convicted of attempted burglary in No. GA043062.  He allegedly suffered on January 4, 1995, a Florida conviction for residential burglary (Florida strike).[5]

The trial court granted a defense motion to strike the Florida strike due to its age in the interest of justice and denied the motion to dismiss the remaining six strike allegations.  (*Romero, supra,* 13 Cal.4th 497; see also § 1385.)

Before sentencing, defendant filed a second *Romero* motion to dismiss the remaining six strike allegations in the interest of justice.  The prosecutor filed opposition.  At separate hearings on the same day, the trial court found true the remaining six-strike allegations and denied the motion.

---

[5]     The Florida strike, the strike in case No. GA043062, and one of the strikes under case No. GA032558 were alleged also to be serious felonies within the ambit of the previous serious felony enhancement statute (§ 667, subd. (a)(1)).  The trial court found these allegations to be true.

At the hearing, defense counsel argued defendant was mentally ill and addicted to drugs and should be allowed to participate in treatment programs. He argued the court should sentence defendant as a second striker in view of such infirmities. The prosecutor argued defendant was not violent, but he remained a danger to the community as "a career criminal, someone who continually invades the privacy and . . . sanctity of people's homes."

In denying the motion, the trial court explained its decision was not easy and the court believed defendant had mental health issues. However, the court was required to take into account his prior convictions for residential burglary, which were serious offenses with victims. While acknowledging its discretion, the court found it would not be appropriate to dismiss the strikes in view of defendant's extensive record. The trial court imposed a 25-year-to-life sentence for his current residential burglary conviction as mandated for a third-strike offender, plus 15 years, or the mandatory 5-year term for each of the prior serious felony enhancements.

### b. Finding defendant falls within spirit of Three Strikes law not abuse

Defendant contends the trial court abused its discretion in refusing to dismiss the remaining six strikes. We disagree.

"'Pursuant to section 1385, subdivision (a), "in furtherance of justice," the trial court may dismiss an allegation or vacate a finding that a prior serious or violent felony conviction qualifies as a strike under the Three Strikes law. On appeal, we review the court's ruling under the abuse of discretion standard. [Citations.]

""'The governing canons are well established: 'This discretion . . . is neither arbitrary nor capricious, but is an impartial discretion, guided and controlled by fixed legal principles, to be exercised in conformity with the spirit of the law, and in a manner to subserve and not to impede or defeat the ends of substantial justice. [Citations.]' [Citation.] . . . '[A]ll exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and legal policies appropriate to the particular matter at issue.' [Citation.]" [Citation.]

11

"'The abuse of discretion standard "is deferential. . . . But it is not empty." [Citation.] The touchstone for that standard, where a trial court is asked to dismiss a prior serious or violent felony conviction which qualifies as a strike "in furtherance of justice" pursuant to section 1385, subdivision (a) . . . is whether "in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant *may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.*" [Citations.]' [Citation.]" (*People v. Stone* (1999) 75 Cal.App.4th 707, 716-717.)

The reviewing court "must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.)

The trial court did not abuse its discretion in finding defendant did not fall outside the spirit of the Three Strikes law, in whole or in part. Society has a valid interest in incarcerating a "revolving door" career criminal. (*People v. Williams, supra,* 17 Cal.4th at p. 160; *People v. Stone, supra,* 75 Cal.App.4th at p. 717.) The trial court had reviewed the evidence establishing defendant's five strikes in No. GA032558 and a sixth strike in No. GA043062.[6] The trial court therefore necessarily was aware of defendant's extensive

---

[6] The probation report reflects defendant's criminal history began in 1987 with a conviction in a California case for indecent exposure (Pen. Code, § 314) and a four-day jail sentence and two years of probation. In 1988, he was convicted in a California case of three counts of indecent exposure with a prior and placed on probation for 36 months. His probation was terminated following multiple probation violations, the last in May 1990, for which he served jail terms. In 1989, he was convicted in a California case of tampering with a vehicle (Veh. Code, § 10852) and placed on probation for three years. In 1992, he was convicted in a Florida case of prostitution and first degree theft and

12

prior criminal history consisting primarily of residential burglary convictions, which are serious offenses (§ 1192.7, subd. (c); see also § 667, subds. (a)(4), (d)(1), 1170.12, subd. (b)(1)). In mitigation, the court considered defendant's mental health issues. In balancing these factors, the court did not act arbitrarily or capriciously in determining defendant's extensive criminal history reflected he was unlikely to lead a law-abiding life, and thus, he remained a risk to society. The court therefore properly sentenced defendant under the Three Strikes law.[7]

---

sentenced to nine months in jail, which sentence was suspended. In 1993, he was convicted in a Florida case of narcotic equipment possession and cocaine possession for which he was sentenced to one month and 14 days in jail. In that same year, he was convicted in a Florida case of another instance of possession of narcotics equipment for which he was sentenced to jail for one month and a day.

In 1994, he was convicted in a Florida case of larceny and grand theft and sentenced to prison for three years. In 1995, he was convicted in a Florida case of burglary and dangerous drug violation and received a three-year prison sentence. In 1995, he was convicted in a Florida case of residential burglary and sentenced to prison for three years. In 1997, in a California case, he was convicted of burglary (Pen. Code, § 459; case No. GA032558). He was sentenced to prison for six years. Later that year, he was convicted in case No. GA033411 of burglary (Pen. Code, § 459) and was sentenced to prison for two years. In 1999, he was convicted of being under the influence of a controlled substance (Health & Saf. Code, § 11550, subd. (a)) and vandalism (Pen. Code, § 594, subd. (a)) for which he was sentenced to jail for 120 days and 14 days, respectively. In 2001, he was convicted in case No. GA043062 of burglary and sentenced to prison for nine years. In 2007, he was convicted in a California case of stalking (Pen. Code, § 646.9, subd. (a)) and placed on summary probation for three years, which included a 15-day jail term.

[7] We disagree with defendant's companion contention that application of the mandatory Three Strikes law resulted in "an unjust sentence," because "[a] 21 or 27 year sentence would have been more than sufficient punishment in this case." Also unsuccessful is his contention the trial court should have considered the five prior convictions he suffered in case No. GA032558 to be a single strike. Defendant acknowledges three of his five prior convictions in case No. GA032558 involved different victims, and he does not challenge the current alleged strike (case No. GA074799). He therefore concedes he has suffered four strikes under the Three Strikes law. Even if the five prior convictions in case No. GA032558 were considered a single strike, he still suffered the minimum two strikes, one under No. GA032558 and a second

### 3. Sentence Not Cruel and Unusual Punishment

Defendant contends his sentence violates the Eighth Amendment's ban against cruel and unusual punishment, because "all of the crimes [committed by him] were the result of [his] serious drug addi[c]tion and lengthy history of mental illness" and "the punishment imposed upon [him] for this non-violent crime [of burglary], is greater than the punishment for the crime of murder (25 years to life)." We are unpersuaded.

Initially, we point out defendant does not challenge his current conviction for burglary or the findings that he suffered six prior convictions which qualified as strikes under the Three Strikes law, nor does he challenge the calculation of the length of his sentence itself.[8] Any drug addiction and/or mental illness suffered by defendant therefore has no bearing on the fact of his prior and current convictions, and these matters do not affect the mandatory punishment imposed under the Three Strikes law.

His cruel and unusual punishment challenge is based on the fatal fallacy his Three Strikes sentence is solely for his current burglary conviction. Rather, defendant's punishment is based also on his criminal recidivism, which the Three Strikes law addresses. It is well-settled a sentence under the Three Strikes law does not violate the Eighth Amendment. (See, e.g., *People v. Cooper* (1996) 43 Cal.App.4th 815, 824-825 [25 years to life for nonviolent and nonserious felony conviction with at least two prior convictions for violent or serious felonies]; see also *People v. Romero* (2002) 99 Cal.App.4th 1418, 1424 [25 years to life for stealing magazine with priors for first degree burglary and lewd conduct with child under age 14].)

---

under No. GA043062 for a third strike sentence. Under either scenario, his prison sentence is 25 years to life. (§§ 667, subd. (e)(2)(A)(ii), 1170.12, subd. (c)(2)(A)(ii).)

[8]     His Three Strikes indeterminate sentence of 25 years to life on his burglary conviction was increased by a determinate sentence of 15 years, or a mandatory 5 years for each of his three prior serious felony convictions, which he also does not challenge.

**DISPOSITION**

The judgment is affirmed.


GRIMES, J.

We concur:


BIGELOW, P. J.



FLIER, J.